[Crim. No. 4289. In Bank.—July 30, 1940.]

THE PEOPLE, Respondent, v. EARLE E. KYNETTE and ROY J. ALLEN, Appellants.

John Oliver, Richard H. Cantillon, John E. Glover and Max E. Gilmore for Appellants.

Earl Warren, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and A. H. Van Cott, Jere J. Sullivan and Eugene D. Williams, Deputies District Attorney, for Respondent.

THE COURT.—On February 18, 1938, the grand jury of Los Angeles County indicted the defendants Kynette, Allen and one Browne, charging them jointly in four counts with conspiracy to commit murder, attempted murder, assault with intent to murder and malicious use of explosives. A demurrer was interposed to the indictment. Upon motion of the prosecution the trial court made certain minor amendments therein and disallowed the demurrer. At the arraignment defendants entered pleas of not guilty to each of the four charges and proceeded to trial before a jury. At the conclusion of a protracted joint trial, the jury returned verdicts finding Kynette guilty of attempted murder, assault with intent to murder, and malicious use of explosives. Allen was found guilty on the charge of malicious use of explosives. Browne was acquitted on all charges. Motions for new trial and in arrest of judgment were made and denied. Judgment was thereupon entered against Allen, sentencing him to the state prison on count four for the term prescribed by law. Following the overruling of objections to the pronouncement of judgment against him on counts three and four, judgments and sentences were entered against Kynette for attempted murder and as-

sault with intent to murder, which sentences were to run concurrently, and for the malicious use of explosives, the latter sentence to run consecutively. Thereafter Kynette moved to vacate the sentences on the charges of attempted murder and assault with intent to murder on the ground that the verdicts thereon were inconsistent with that on the charge of malicious use of explosives. The motion was denied. Kynette and Allen thereupon appealed from the judgments and orders denying their motions for new trial.

A voluminous record is before us. The reporter's transcript is approximately five thousand pages in length. Briefs in excess of two thousand pages have been filed. An examination of this involved record discloses that many of the assignments are common to both appeals, and these will accordingly be considered together. However, contentions peculiar to either appeal will be so designated.

We shall first consider the sufficiency of the evidence to sustain the convictions. Sharp conflicts exist in the great mass of evidence adduced upon the trial. These conflicts have been resolved by the jury's verdicts in favor of the prosecution and against the appellants as to the offenses of which the latter stand convicted. We shall therefore state only so much of the evidence and background as appears necessary to demonstrate that the verdicts of the jury are adequately supported therein.

It appears from the evidence that for some time prior to the commission of these offenses there existed in the police department of the city of Los Angeles an organization known as the Special Intelligence Unit, which had its headquarters separated from the rest of the department. For approximately two years, Kynette, a police officer, was in charge of this special unit as acting captain. Allen, also a police officer, likewise had been a member of this special unit for some time. Throughout the trial and upon these appeals, the prosecution has repeatedly asserted that the membership of this special unit, consisting of some eighteen or twenty men, was largely engaged in setting dictaphones, spying upon, "tailing" and in general conducting an extensive espionage of persons who might engage in any political activities opposed to the interests of the then incumbent city administration.

On January 14, 1938, one Harry Raymond, who was then being subjected to surveillance by this special intelligence

unit, was almost fatally injured as a result of an explosion which occurred when he pressed the starter button on his automobile, in the garage of his home. It appears that Raymond had much to do with both the appointment and subsequent resignation of one Harry Munson as a police commissioner of the city of Los Angeles under the administration that assertedly employed the intelligence unit of the police department for its political protection. Munson had become indebted to one Ralph Gray for campaign work and the latter upon nonpayment procured a judgment therefor. Gray was attempting to collect the money and satisfy the judgment while Munson claimed to be without financial resources to discharge it. On June 17, 1937, a hearing was scheduled on an order to examine into Munson's financial status. Raymond, friend of the judgment creditor Gray and then enemy of the debtor Munson, was thought to possess certain information as to the latter's finances which would "put the heat" on the administration and "blow the lid off the city hall". Raymond attended the hearing, as did Kynette, then acting captain of the intelligence unit of the police department. Kynette inquired of Raymond as to the nature of the matter and was invited by the latter to take a seat and listen to the court proceedings. However, the hearing was postponed and all persons left the hearing room in the Hall of Records. When on the sidewalk Kynette, according to Raymond's testimony, came over to him and after an exchange of preliminary remarks stated: "this thing has got to stop. You can't turn any heat on the administration. . . . There is nothing going to happen to Munson. . . . Now, if there is any further trouble or any further bothering of Munson, you know I am the head of the intelligence squad. . . . I hope you don't try to get too tough, because you remember what happened to that little boy Red Foster." The evidence showed that "Red" Foster had been "bombed out in his room". When on the stand in his own defense, Kynette admitted attending the Munson hearing and corroborated Raymond as to the substance of their conversation in the courtroom. He also admitted having a later conversation on the sidewalk but denied that the substance thereof was as related by Raymond.

Almost immediately thereafter Kynette, with the aid of certain members of his intelligence squad, set up an espionage upon Raymond. At the direction of Kynette a "spy house"

was rented by one of the members of the squad acting under an assumed name. This house was in the immediate neighborhood of Raymond's home and commanded a view thereof. It was obtained for the purpose of installing a dictaphone in Raymond's home and to observe his every move. Practically every activity of Raymond from the time he arose in the morning until he retired at night was under the surveillance of members of the intelligence squad detailed in shifts to the "spy house" or engaged in "tailing" him as he moved about the city. Allen was assigned to the "spy house" in October, 1937, and did his share toward covering every move of Raymond. In January, 1938, Kynette stated to a witness that he was tracing Raymond's career in an effort to ascertain why he was giving information to the civic committee, and stated that Raymond was giving false information as to vice establishments in order to collect money from the city administration. On occasions Kynette and Allen were observed examining Raymond's parked automobile. In December, 1937, a man resembling Kynette was observed by Mrs. Raymond in the middle of the night examining the door of their garage with the aid of a flashlight. Raymond testified that as he passed Kynette and some other men on the street early in January, 1938, Kynette declared that "it won't be long until I take care of him". A foundryman having his place of business in the city of Los Angeles testified that early in January, 1938, Kynette, accompanied by a tall man, came to his foundry and inquiry was made by them about pipe or tubing stating that they wanted "something thin that will break easy in small pieces". They were directed elsewhere by the witness. On the night of January 13th and until approximately 4 o'clock on the morning of January 14, 1938, the neighbors testified that there was considerable activity in the "spy house". The witness Sakalis, a fruit and vegetable peddler who lived across the alley from the "spy house", testified that he was awakened by three men who were talking in the alley and who immediately went into the "spy house" after the witness remonstrated with them. His wife testified that she later heard footsteps going down the alley from the "spy house" toward Raymond's home and in about one-half hour heard return footsteps. Apparently this was the only night that there had been such late activities at the "spy house" for the neighbors had not previously heard the occupants.

Allen admitted being on duty there with the acquitted officer Browne on that night. Allen claims, however, to have left the "spy house" at about 11 P. M.—a matter which the jury undoubtedly considered and determined in the light of all the evidence.

On the morning following this unusual activity at the "spy house", the explosion of a bomb occurred when Raymond pressed the starter button of his automobile. Fragments of iron pipe and wire were found in the vicinity of the car and garage after the bombing. Experts who had studied these fragments concluded that the bomb used was "a three inch malleable wrought iron pipe with a cast iron cap at each end, the pipe of unknown length". Here, it should be recalled that a foundryman testified that Kynette and another man had previously inquired about piping that would "break easy in small pieces". Under the routine theretofore followed at the "spy house" when Allen and his partner left the house on the night preceding the bombing, they would normally reopen the house and resume their surveillance of Raymond the following morning. Instead they did not return the following or any other day, and such espionage as was thereafter carried on from the house was done by other members of the unit who apparently did not know what had happened. Sakalis, the vegetable peddler who had remonstrated with three men for their activity in the alley late on the night preceding the bombing, also testified that a few mornings thereafter while proceeding on his vegetable route he was followed into the hills in back of Glendale by two men in an automobile who stopped him, dragged him from his truck, beat him and told him to keep his mouth shut as to what he knew concerning the Raymond bombing. Sakalis definitely identified these men as Kynette and Allen and referred to them as his "neighbors" in the "spy house". The jury might reasonably infer that the only persons who would have any interest in silencing Sakalis as to any knowledge he might possess pertinent to the bombing would be the participants therein. As stated, Sakalis was assaulted in the morning. Later that same day Allen left the city for a mountain resort. Although while there he had been in telephonic communication with Kynette and had been informed that he was wanted by the police and the district attorney, he remained away for several days. He attempted to explain his absence

as a vacation. It is significant that while the homicide squad of the police department was exerting every effort to solve the bombing outrage and track down the perpetrators thereof, the members of the intelligence unit, including Kynette as acting captain thereof, failed to disclose that for months they had had the victim thereof under constant surveillance and were familiar with the movement of all persons and vehicles in and about the Raymond home, which information, if disclosed, conceivably might have been of assistance in the solution of the crime. The prior espionage of Raymond by the intelligence unit came to light as a result of the efforts of the homicide squad. In view of this the jury may well have reasoned that innocent men, occupying positions as police officers, would not have remained silent but would have come forward and immediately advanced all of their information in the hope of apprehending the offenders.

While a suspect, Kynette, in response to inquiry by members of the homicide squad as to his whereabouts on the night preceding the explosion stated that until 10 o'clock he had been at a reserve officers' meeting and that thereafter he ''was on a secret mission'' for the mayor, the nature of which mission he would not divulge. Upon the trial, he testified to attending a reserve officers' meeting in the early evening (and in this he was corroborated by others there attending) and that from the meeting he went to his office for a brief period before retiring to his home where he assertedly arrived at approximately 11:45 o'clock. Contrary to Kynette's original testimony on the point, it appears from testimony of telephone company employees that on the night following the day of the bombing he made two or three unsuccessful efforts to telephone to the brother of the then mayor who was in Mexico City and from whom he assertedly received his orders as head of the intelligence unit. Failing to make the desired connection he spoke with the then chief of police, also in Mexico City. The purpose of such a call and any inconsistencies in the testimony of Kynette with respect thereto were matters for the jury to consider. Among other things, the witness Gray, whom the victim Raymond prior to his injuries was attempting to assist in collecting an indebtedness from the ex-police commissioner Munson, testified that while he was visiting with Raymond at the hospital on the day following the bombing he received a telephone call from a person whose

voice he recognized as Kynette's, and that the caller, after learning that the victim Raymond was "resting better" declared "That's too bad. Next time we will do a better job. You're next, Mr. Gray, maybe tomorrow, next day or next week, but we will get around to you and we will do a better job on you than we did on Mr. Raymond." The audacity of such a statement is appalling, but the jury may well have concluded that the author thereof, deeming himself secure in his political entrenchment, felt safe in making these threats.

During a search of Kynette's home by members of the homicide squad and the police chemist, certain wire was found by the latter on the work bench in the garage. It was found to consist of two strands, one white covered and the other black covered, of California Cap Company detonator leg wire, a type of wire produced only by the named company and attached to and constituting leg wires for electric detonators. Such wire is not readily available on the market. As stated earlier, fragments of wire and other substances had been picked up by investigators at the scene of the bombing. Experts segregated and examined these fragments and among them found what was determined to be both white and black covered California Cap Company detonator leg wire, similar to that found in appellant Kynette's garage. There was evidence as to gauge, insulation wrappings, enamel color of insulation, lengths of wires, etc., from which the jury might infer that the wire found in Kynette's garage represented the unused portions of the detonator leg wire employed in the Raymond bomb. The testimony of prosecution experts would support such inference. The opinions of these experts were also based, among other things, upon the similarity as to the quantity of impurity in the copper of the black covered wires found in Kynette's garage and at the scene of the explosion and of the similarity of impurity in the white covered wires found at each place, though singularly enough the black and white wires regardless of where found were not similar in quantity or impurity. The prosecution experts testified that there was no substantial dissimilarity between the wires found at the scene of the bombing and those found in Kynette's garage.

Enough of the evidence has been set forth to illustrate that there exists therein ample support for the jury's verdicts, and we shall hereinafter refer to such other portions as are

pertinent to the consideration of appellants' assignments of error. By way of recapitulation, there was proof of the *corpus delicti,* proof of sufficient motive, proof of opportunity for the appellants to commit the offenses and lack of opportunity for others (because of the close surveillance of the victim by the appellants), and proof of acts and declarations of the appellants tending to disclose a consciousness of guilt. From all of this the jury reasonably could conclude that the appellants were guilty in the particulars indicated by the verdicts.

■ Appellants next assert that they were deprived of due process of law and equal protection of the law when the trial court excused certain talesmen who declared that they had conscientious scruples against voting for the inflicting of the death penalty. The contention is that inasmuch as there are no degrees of conspiracy, the jury was powerless to fix the degree of the murder the appellants had assertedly conspired to commit and therefore was equally powerless to impose the death penalty. The appellants were ultimately acquitted on the conspiracy charge and upon final selection of the jury had not fully exhausted their peremptory challenges. Aside from this, however, we find no merit in the contention. Under subdivision 8 of section 1074 of the Penal Code, "A challenge for implied bias may be taken . . . (8) if the offense charged be punishable with death, the entertainment of such conscientious opinions as would preclude his finding the defendant guilty, in which case he must neither be permitted nor compelled to serve as a juror". Count one of the indictment charged the appellants with conspiracy to commit murder. Under section 182 of the Penal Code, criminal conspiracy is "punishable in the same manner and to the same extent as in this code provided for the punishment of the commission of the said felony". Section 187 of the Penal Code defines murder as the "unlawful killing of a human being, with malice aforethought". Such malice, under section 188, may be express or implied, and is express when "there is manifested a deliberate intention unlawfully to take away the life of a fellow creature". Section 189 divides murder into degrees and declares that all murders perpetrated by certain designated means, and "any other kind of wilful, deliberate, and premeditated killing" are of the first degree. Murder of the first degree, under the provisions of

section 190, is punishable either by death or life imprisonment in the discretion of the jury.

We are satisfied from an examination of the above-cited code sections that a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the "willful, deliberate and premeditated" intention to kill a human being. A murder committed in pursuance of such an agreement would unquestionably be a "willful, deliberate and premeditated" murder of the first degree and punishable by death or life imprisonment. Consequently, if the fact of a conspiracy to commit murder is established, the first punishment clause of section 182 applies and the conspirators are punishable in the manner prescribed by section 190, i. e., by death or life imprisonment. This being so, the court below properly excused prospective jurors entertaining conscientious opinions against infliction of the death penalty. In so doing, the court merely complied with the mandate of subdivision 8 of section 1074, *supra.*

Appellants next challenge the propriety of certain rulings of the trial court admitting evidence tending to establish that the intelligence unit as a part of its espionage of Raymond had tapped the telephone wires leading into his home. Upon examination by the prosecution, several members of the intelligence unit refused to answer questions as to wire tapping at the Raymond home on the ground it might tend to incriminate them. Among others, the prosecution then called certain residents of the bungalow court wherein the "spy house" was situated. These witnesses generally testified to seeing one of the members of the intelligence unit up on a nearby telephone pole, to noticing wires thereafter running from the "spy house" to the telephone pole and to observing one of the occupants of the house sitting at a telephone and writing. The testimony of telephone company officials established that no telephone had been ordered for or established in the "spy house". The obvious inference for the jury to draw was that telephone wires leading to the Raymond home had been tapped. Appellants' argument is that since wire tapping is an offense under section 640 of the Penal Code, it was error to permit the introduction of evidence tending to show the commission of this separate and distinct crime. The rule relied upon is of course well estab-

lished, but the evidence was clearly admissible under the equally well-established exception thereto. ▮ The rule against the admission of evidence of other crimes does not exclude such evidence when it tends to prove any fact necessary or pertinent to the proof of the crime for which a defendant is being tried. (8 Cal. Jur. 60–73; *People* v. *Burkhart,* 211 Cal. 726, 731 [297 Pac. 11].) In other words, the commission of another crime *in no way connected* with the crime charged cannot be proved. Under the prosecution's theory, the asserted wire tapping was in furtherance of the original conspiracy to murder Raymond as charged in count one of the indictment. Section 1104 of the Penal Code requires that "one or more overt acts" must be alleged in the indictment, and proved, to warrant a conviction for criminal conspiracy. But "other acts not alleged may be given in evidence". Here, in compliance with the code section, the indictment alleged commission of certain overt acts toward accomplishment of the conspiracy, and proof of such other overt acts as wire tapping was clearly admissible. By their pleas of not guilty the appellants denied the conspiracy and other charges and any evidence showing preparation therefor or tending to establish their commission was proper. Under the prosecution's theory, for the espionage of Raymond it was essential that those spying upon him have full knowledge of his actions and contemplated movements. Information gathered from the tapping of his telephone would materially assist in this respect, particularly in view of the disclosed inability to place a dictaphone in Raymond's home. *People* v. *Glass,* 158 Cal. 650, 682 [112 Pac. 281], relied on by the appellants, is not inconsistent with our holding. While factually distinguishable that case recognizes the exception to the general rule. ▮ As stated, the wire tapping was a part of the conspiracy alleged, and an overt act in preparation of the assault on Raymond. At the time of the admission of evidence thereon it was for the jury to determine under all the evidence whether Allen's connection with the conspiracy antedated or followed such wire tapping incident. His actual presence at the "spy house" at the very moment of the wire tapping incident was not indispensable. The "listening-in" on the Raymond telephone occurred, at least in part, when Allen was assigned to the "spy house".

■ As another phase of the wire tapping incident, appellants urged that the prosecution was guilty of prejudicial misconduct in calling to the stand officers Phegley, McDonald and Draper, members of the intelligence unit who concededly had done surveillance duty at the "spy house", and interrogating them, over objection, upon their activities at that place, particularly with reference to any tapping of the Raymond telephone. These witnesses consistently and repeatedly stood upon their constitutional right and refused to divulge such information upon the ground it might tend to incriminate them. Inasmuch as the witnesses are claimed to have asserted the same right prior to trial when they were examined in the district attorney's office and before the grand jury, appellants charge that the prosecution acted in bad faith in calling as its witnesses these persons who assertedly were or should have been defense witnesses and then discrediting them before the jury by interrogating them upon the subject of wire tapping knowing that they would, as on previous occasions, stand on their constitutional right not to answer upon the ground that it might tend to incriminate them. We find nothing of a prejudicial nature in the questions propounded, the rulings on the objections thereto, or in the occasional remarks of counsel. With respect to the latter, the trial court when necessary admonished the jury to disregard them. The fact that these witnesses previous to the trial had asserted extrajudicially their constitutional right to refuse to answer did not preclude the prosecution from calling them upon the trial and interrogating them under oath, upon the subject of wire tapping in the hope that in the *interim* they might have undergone a change of mind and be willing to disclose such information. ■ Moreover, a witness may not constitute himself an arbitrary or exclusive judge as to whether evidence called for by a question may tend to incriminate him. The matter is for the trial court to decide in the light of all the evidence. (*Ex parte Stice,* 70 Cal. 51, 53 [11 Pac. 459]; *In re Berman,* 105 Cal. App. 37, 49 [287 Pac. 126]; *Overend* v. *Superior Court,* 131 Cal. 280, 283 [63 Pac. 372].) The fact that the cited cases were civil in character does not alter the soundness of the principle therein enunciated. As stated in Wharton's Criminal Evidence, section 469, quoted in the last cited case, "The witness is not the sole judge of his liability. The liability must appear reason-

able to the court, or the witness will be compelled to answer.'' Obviously, in the absence of questions to the witnesses by the prosecution, the court below would not be in a position to rule on the matter. Nowhere is complaint made that any witness was improperly compelled by the trial court to answer interrogatories tending to incriminate him.

In view of our conclusion on the assignment last considered, there can be no merit in appellants' next contention that the court below erred in refusing to grant their motion to strike from the record all questions which the above-named three witnesses had refused to answer based on the constitutional privilege. Nor do we find any merit in the contention that the trial court erroneously refused to inform or instruct the jury as to the effect, if any, of the refusal of witnesses other than the appellants to respond to questions upon assertion of their constitutional privilege against self-incrimination. The point arose when the first of the three named officers, Draper, took the stand. At that time, in response to appellants' request, the trial court correctly stated: ''I will instruct the jury that no inference is to be drawn from the fact that the witness refused to testify, especially no inference reflecting on the defendants. As to the witness himself, why, you are the sole judges of his credibility in other matters, and he stands before you merely as a witness in the case, but I do repeat what I said, that *no inference as to the guilt or innocence of the defendants* is to be drawn from his refusal.'' In view of this proper and clear instruction, it was not necessary for the court below to restate the same upon every request by the appellants as the situation repeated itself throughout the trial. The case of *People* v. *Black*, 73 Cal. App. 13, 29–34 [238 Pac. 374], cited by the appellants, is clearly distinguishable, for there under the contention of the district attorney and the admonitions of the trial court the jury was permitted to draw such inferences ''as the case may justify'' and ''as you desire'' from the refusal of a witness to answer questions on the ground that they might tend to incriminate him. As there pointed out, the jury was thereby permitted to draw any inference it chose as to the guilt or innocence of the defendant from the refusal of a witness other than the defendant to testify on the constitutional ground of privilege. Here, no such inference was permitted. The trial court expressly instructed the jury it could draw no inference as to the appellants' guilt or inno-

cence from the refusal of others to testify on the constitutional ground.

Appellants also challenge the propriety of the action of the district attorney in referring in his closing argument to the claim of privilege asserted by said witnesses with respect to the subject of wire tapping. They concede that no objection was voiced by them at the time which would have afforded the trial court opportunity to rectify any asserted error. But, apart from this, we find no error in the argument of the district attorney. It conformed with the trial court's earlier instruction. The district attorney generally argued that the jury was not to draw any inference ''against these defendants to the effect that they are guilty of anything'' from the refusal of others on constitutional grounds to answer questions relative to wire tapping. But that it might consider ''in connection with the credibility to be given to these defendants'' the fact that while others who had been habitues of the ''spy house'' had refused to answer questions relative to wire tapping on the ground it might tend to incriminate them, the appellants had positively denied that there had been any wire tapping. No impropriety appears in the suggestion that the jury consider this circumstance in passing upon the credibility of the appellants. *People* v. *Glass, supra,* merely precludes an inference as to the guilt or innocence of a defendant from the refusal of others to testify on constitutional grounds.

What we have said answers appellants' ancillary contention that the court below erred in refusing to give a requested instruction having to do with the effect of witnesses refusing to testify on the constitutional ground. So far as witnesses other than the appellants are concerned, the instruction or admonition given by the court during the trial, and above quoted, was as already stated, adequate and correct. The refused instruction was too broad. It covered all witnesses in the case, including the appellants, and in view of our conclusion on the contention next following was properly refused.

At the trial appellants took the stand in their own defense and related exculpatory stories in which they denied any and all criminal activity at the ''spy house'' and disclaimed any knowledge of or participation in the Raymond bombing. However, before the grand jury they had asserted their constitutional privilege against self-incrimination in re-

sponse to many questions as to the subject of which upon the trial they unqualifiedly asserted their innocence. In view of this, the prosecution, over objection, was permitted to put in evidence for the limited purpose of impeachment the pertinent portion of the grand jury transcript on the ground that it was inconsistent with the appellants' claimed innocence upon the trial and could be considered by the jury in determining their credibility. Both in its ruling on the objection and in its subsequent instructions, the trial court carefully stated that such evidence was not generally admitted as having any bearing on the question of the guilt or innocence of the appellants, but was admitted for the limited purpose of impeachment and as evidence going to the credibility of the appellants as witnesses upon the trial. We find no error in the ruling or the instruction. The effect was not, as asserted, to destroy the constitutional privilege afforded appellants of answering as they did before the grand jury. In *Nelson* v. *Southern Pac. Co.*, 8 Cal. (2d) 648, 654 [67 Pac. (2d) 682], it was held that a question as to prior refusal to testify on ground of privilege against self-incrimination was proper ''for impeachment purposes since the claim of privilege gives rise to an inference bearing upon the credibility'' of the witness' statement of lack of negligence upon his part. Among others, *Fross* v. *Wotton*, 3 Cal. (2d) 384 [44 Pac. (2d) 350], is there cited. Although these were civil cases, we see no distinction so far as impeachment is concerned in the rights of witnesses in civil and criminal action, including a defendant who, as here, takes the stand in his own defense. Particularly is this so since the 1934 amendment to section 13 of article I of the Constitution which, contrary to earlier practice, permits the court and counsel to comment upon and the jury to consider a defendant's ''failure to explain or to deny by his testimony any evidence or facts in the case against him'', and this ''whether the defendant testifies or not''. By analogy, the use solely for impeachment purposes of a defendant's prior refusal to testify before a grand jury because of fear of self-incrimination, no more destroys that constitutional privilege than does the right to comment upon and consider a defendant's failure to explain evidence against him tend to destroy his equally valuable constitutional right to refuse to be a witness against himself. (In this latter connection see *People* v. *Byers*, 5 Cal. (2d) 676, 685 [55 Pac. (2d) 1177].) It is accordingly unnecessary for us to discuss the

authorities from other jurisdictions cited by appellants. And *People* v. *O'Bryan*, 165 Cal. 55 [130 Pac. 1042], also cited, is clearly distinguishable. The testimony of the defendant therein before the grand jury was not admitted for the limited purpose of impeachment but as evidence on the general issue of guilt or innocence. Under the conditions then existing and for the reasons there stated, the evidence was improperly admitted on the general issue. However, the error was even there held not to be prejudicial.

 Conceding that the instruction as to the effect of a defendant standing mute in the face of an accusatory statement had no proper place in the cause and should not have been included in the charge to the jury, we fail to perceive wherein under all of the evidence the appellants could have been prejudiced thereby. It could not have confused the jury into believing that it had application to those occasions when the appellants had asserted their constitutional privilege against self-incrimination for the court fully and clearly instructed the jury with respect thereto.

 It is next urged that the trial court erred in certain rulings made during the redirect examination of the chief of police, who had been called as a prosecution witness. On direct examination he was generally interrogated as to his position and service with the police department, Kynette's connection therewith, to which superior officer the latter was answerable, and whether the witness had any knowledge of the surveillance of Raymond and of the use of the "spy house" in connection therewith. At no time during his direct examination was the witness asked any questions as to the activities of the intelligence unit commanded by Kynette. However, on cross-examination by defense counsel he was asked such a question and he answered in substance that it was its function "to check on the activities of various *criminal* elements in the community . . . and criminal political elements . . . where there appear to be criminal connections . . . " Thereupon, on redirect examination, the prosecution in line with its theory that the intelligence unit theretofore had been employed principally in political work rather than criminal work, launched into an extensive examination of the witness with a view to determining whether the intelligence unit had not from time to time investigated certain named persons who were wholly free of criminal tendencies but who apparently had been inimical to the then incumbent city ad-

ministration. As stated by the district attorney during the trial, the evidence was pertinent to the subject opened by the cross-examination and had a tendency to establish a motive for the appellants' desire to do harm to Raymond who apparently was causing embarrassment to the city administration or members thereof. The extent of the redirect examination of a witness is largely within the discretion of the trial court. Appellants frankly concede that they know of no case wherein a reversal was had because of the action of a trial court with respect thereto. It is well settled that when a witness is questioned on cross-examination as to matters relevant to the subject of the direct examination but not elicited on that examination, he may be examined on redirect as to such new matter. *People* v. *Corey*, 8 Cal. App. 720 [97 Pac. 907], cited by the appellants, recognizes this rule.

 The contention is made that the trial court committed prejudicial error during the cross-examination of Kynette by permitting the prosecution, over objection, to interrogate him as to matters assertedly not touched on direct examination, and to so conduct the cross-examination as to degrade Kynette and violate his constitutional privilege against self-incrimination. For example, in an effort to refute the theory underlying the prosecution, Kynette on his direct examination attempted to establish, in effect, that the surveillance of Raymond was in the performance of legitimate police activity and that the function and activities of the intelligence unit were confined to legitimate police work. Under the circumstances, there was no error in the rulings of the court below which permitted the prosecution on cross-examination to interrogate the witness concerning other activities of the intelligence unit, of which he was in command, with respect to persons who apparently had been hostile to the city administration. The district attorney clearly declared the purpose of such cross-examination, which unquestionably was related to the direct examination and to Kynette's knowledge of the purpose and activities of the intelligence unit. In furtherance of this cross-examination it was proper to permit the use of the files of the intelligence unit which had been procured under court subpoena. Again the reference to Kynette's temporary suspension from the police department earlier in his career and at a time remote from the Raymond bombing, while perhaps immaterial to the issues of this case, cannot be said to have been prejudicial. We do not deem it

necessary to deal in detail with the many other matters of which complaint is made. ■ The cross-examination of a witness may extend to all matters about which he was examined in chief and may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. (*People* v. *Tyren,* 179 Cal. 575, 579 [178 Pac. 132]; *People* v. *Ryan,* 199 Cal. 513, 521 [250 Pac. 164]; Pen. Code, sec. 1323.)

■ As related earlier in this opinion, the witness Sakalis, a vegetable peddler, and one of the principal prosecution witnesses, had testified to remonstrating with three men in the immediate vicinity of the "spy house" because of their activity late on the night preceding the bombing, and had further testified that a few days thereafter he was followed into the hills while on his vegetable route and was beaten by two men whom he positively identified as Kynette and Allen. It further appeared from the evidence that Sakalis was thereafter placed under police protection and that because of his resulting loss of business and the straitened financial condition of his family he was paid fifty dollars every two weeks by the district attorney's office for a limited period. During the course of a minute and searching cross-examination by defense counsel Sakalis was repeatedly questioned as to whether he had immediately reported the beating and the identity of the perpetrators thereof to anyone and he was likewise closely questioned as to the payments he had been receiving from the office of the district attorney. The undoubted purpose of such cross-examination was to impeach the credibility of the witness and to attempt to establish that his story was probably of recent fabrication and perhaps influenced by the payments so received. Accordingly, on redirect examination the prosecution properly asked Sakalis, without objection, whether he had reported the matter to anyone and he answered in the affirmative, naming two persons. These two persons were produced by the prosecution and testified, over objection, in a manner indicating that Sakalis had made statements to them prior to the trial which were consistent with his testimony upon the trial. It is urged that the trial court erred in admitting the testimony of these witnesses as to conversations occurring out of the presence of appellants. When a witness has been charged with improper motives of interest, or improper influences, or with recent fabrication, the law allows hearsay statements to be introduced

for the purpose of showing that the same and consistent statements had been made at a time prior to the alleged fabrication or prior to the time the motive of interest existed. Such evidence is then admitted, not to prove the facts of the case, but as tending to show that the witness has not been controlled by motives of interest, and that he has not fabricated something for the purposes of the case. (*Clark* v. *Dalziel,* 3 Cal. App. 121, 124 [84 Pac. 429] ; *People* v. *Billings,* 34 Cal. App. 549, 554 [168 Pac. 396] ; 27 Cal. Jur. 178, sec. 153.) The trial court both at the time of its admission and at the close of the trial admonished the jury, as required by the authorities, that this particular evidence was limited to the credibility of Sakalis.

 Along this same line, the appellants contend that the court below erred in permitting the prosecution, over objection, to put in evidence a conversation out of their presence between one of the bodyguards of the witness Sakalis and the district attorney in which the former narrated to the latter the dire financial condition of Sakalis as a result of the interruption of his business by reason of the police protection essential to him as a potential witness. As a result of this report, the office of the district attorney commenced the bi-weekly fifty dollar payments above mentioned. The conversation was testified to by the bodyguard who participated therein and by the witness Sakalis in whose presence it was held. This testimony was offered by the district attorney and admitted by the court as bearing upon the credibility of Sakalis. It tended to indicate the information upon which the office of the district attorney ordered the payments to be made to the witness while under guard and to refute the innuendo arising from the minute cross-examination of Sakalis that the payments may have been made to influence his testimony or to cause him to fabricate a story against the appellants. We find no error in its admission. As stated in 6 Wigmore on Evidence, third edition, 177, section 1766, ''If therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the hearsay rule does not apply.'' In the cases cited by appellants the hearsay testimony related either to the *corpus delicti* or to the defendant's connection therewith. Such is not our case.

 During the cross-examination of Sakalis by defense counsel he was asked whether he had told a named individual

that in addition to the above payments he was getting "$3,000 for testifying here". The witness denied having made such a statement and at no time was the named person produced by the defense to refute his denial. However, on redirect examination of Sakalis the prosecution, apparently in an effort to clarify the impression created by such cross-examination, asked the witness if at any time anyone had offered him $3,000 and he replied that at a designated time and place a stranger had offered him $3,000 "to shut my mouth, not say anything". On recross-examination the defense inquired as to the identity and description of said person. No objection was immediately interposed to the quoted redirect testimony but a day later the defense unsuccessfully moved to strike it out, the court reserving a final ruling. Apparently the matter was not further pressed by the defense. It is now urged that the court below erred in not granting the motion to strike. We are of the view that by their cross-examination as to a possible $3,000 bribe of the witness, the defense opened the door to the redirect examination which resulted in the testimony of which complaint is now made. The general rule and the authorities on this proposition, referred to earlier in this opinion, need not here be repeated.

■ Complaint is next made of the production in evidence, over objection, of a model bomb, the contention being that no proper foundation was laid therefor. The prosecution experts, who were amply qualified, testified at great length as to the kind and character of the fragments of the bomb found at the scene of the explosion. From their examination and study of these fragments and from the nature of the destruction wrought in the Raymond garage they expressed their expert opinions as to the kind of bomb that had been employed. They then identified a model bomb which had been constructed by them or under their supervision and testified that while not necessarily identical it represented substantially and approximately the type of bomb which had been used in the Raymond bombing.

In answer to defense counsel's objection, the trial court declared that the model "picturizes" what the expert then on the stand "has already described". The use of maps, models, diagrams, and photographs as testimony to the objects represented rests fundamentally on the theory that they are the pictorial communications of a qualified witness who uses this method of communication instead of or in addi-

tion to some other method. (3 Wigmore on Evidence, 3d ed., 173, sec. 790; see, also, *People* v. *Ferdinand,* 194 Cal. 555, 564 [229 Pac. 341] ; *People* v. *Glab,* 15 Cal. App. (2d) 120, 123 [59 Pac. (2d) 195] ; *People* v. *Phelan,* 123 Cal. 551, 568 [56 Pac. 424].)

 Nor do we find any error in the trial court's ruling admitting in evidence an exhibit containing pieces of wire. Contrary to the appellants' contention, the wires making up the exhibit were sufficiently identified by a prosecution expert as wires that had been picked up by him at the scene of the Raymond explosion or retrieved at the same place by other named persons engaged for a similar purpose.

As intimated earlier in this opinion, Pinker, the police chemist, while searching the appellant Kynette's garage found certain wire which, as above stated, closely resembled fragments of wire found at the scene of the explosion and apparently used in the bomb. Shortly thereafter, Pinker showed the wire to the police captain who served as superintendent of the bureau of records and identification. A few days later it was turned over to certain other police superiors, the same wire ultimately reaching the hands of one of the prosecution experts for examination and study. It is now urged that the court below erred in its rulings on certain preliminary foundational questions and in excluding from evidence the rules and regulations of the police department, the theory being that such rules and regulations, if admitted, would have tended to show that Pinker had violated them in that he had not "booked" the wire with the property clerk. The impropriety, if any, was immaterial. The identification of the wire by Pinker was positive. The rules and regulations merely require a booking of property "without unnecessary delay". The temporary retention of the wire for examination and proper marking for identification purposes prior to its delivery to superior officers did not constitute a violation thereof.

 Appellants' next contention has to do with the action of the trial court in admitting in evidence a copy of "The Pacific Clipper", a newspaper published by a negro named Alexander who apparently had been making assaults upon the city administration. During his examination on the witness stand Kynette admitted that Alexander previously had been under investigation and surveillance by the intelligence unit of the police department. The newspaper

was identified as a part of the files of the intelligence unit which had been procured by the prosecution by *subpoena duces tecum*. It was offered under the prosecution's theory that the real purpose of the intelligence unit was not the performance of legitimate police duty but the elimination of persons hostile or inimical to the then incumbent city administration. Such evidence would be relevant to the motive underlying the Raymond bombing. The court admitted it for a limited purpose, stating that "it is not to be considered by the jury that any of the contents of the newspaper are deemed to be true or otherwise but simply the knowledge of what was going on". We find no error in the admission of such exhibit.

 The next five assignments of the appellants have to do with the refusal of the trial court to give certain requested instructions. A brief discussion will be sufficient, for we have examined the entire charge to the jury and it adequately and fairly covers the issues. The first refused instruction concerned the presumption of innocence. This subject was adequately covered by the instruction given by the court, which followed the language of section 1096 of the Penal Code. Section 1096a of the same code declares that no other instruction need be given on the subject. (See *People* v. *Cohen,* 94 Cal. App. 4, 6 [270 Pac. 377]; *People* v. *Leddy,* 95 Cal. App. 659, 678 [273 Pac. 110]; *People* v. *Ilderton,* 14 Cal. App. (2d) 647 [58 Pac. (2d) 986]; *People* v. *Magsaysay,* 210 Cal. 301, 302 [291 Pac. 582].) The subjects of the other refused instructions were likewise covered by other proper instructions given by the court.

 It is next urged that the district attorney improperly illustrated his argument by reference to a well known New York trial wherein the prosecution kept witnesses in order to insure their protection. It is also contended that the district attorney otherwise improperly expressed opinions during his discussion of the witness Sakalis and the necessity for keeping him under guard and making payments to him. The details need not be narrated. Counsel may illuminate his argument by illustrations which may be as various as the resources of his talents. He may refer to matters of common knowledge, not special to the case, and to well known historical incidents. (*People* v. *Molina,* 126 Cal. 505, 507 [59 Pac. 34]; 8 Cal. Jur. 272, sec. 333.) The trial court admonished the jury to regard as such any ex-

pression of opinion by the district attorney, and not to be prejudiced against the appellants by reason thereof. A portion of the argument complained of referred to certain matters touched upon by the evidence. They were matters that might properly be called to the jury's attention for whatever value it desired to attach to them. In *People* v. *Cook*, 148 Cal. 334 [83 Pac. 43], cited by the appellants, the district attorney gave a recital of purported facts having no support in the evidence. Each case must turn on its own peculiar facts. We cannot say that the argument of the district attorney resulted in any prejudice to the appellants' cause.

As before stated, it was the theory of the prosecution throughout the trial that Raymond was under surveillance and bombed because he was believed to be hostile and inimical to the city administration. Inspection of Kynette's testimony, both on direct and cross examination, definitely indicates that it was his purpose to establish that the surveillance of Raymond was undertaken in the ordinary course of legitimate police work and pursuant to orders from the then chief of police who assertedly stated to him that Raymond and others were connected with a conspiracy to obtain false affidavits concerning a member of the grand jury. Thereafter counsel for the defense offered in evidence certain indictments of Raymond and other supporting documents for the stated purpose of corroborating Kynette's testimony as to his asserted motive and intent in keeping Raymond under surveillance. We find no error in the ruling rejecting this evidence. Obviously, the truth or falsity of the information underlying the order of the chief of police to Kynette to place Raymond under surveillance would not tend to corroborate or establish the truth of Kynette's testimony that his surveillance of Raymond was based solely on the order. The material fact for the defense to establish was that the surveillance was prompted by the order of the chief of police. In other words, the question was whether Kynette did receive the information and act upon it, and not whether the information was true. The rejected evidence was not offered to prove that anything Kynette said he had done was actually done.

The appellants quote many excerpts from the comment of the court to the jury at the close of the evidence, to support their charge that it was "argumentative and char-

acteristically an act of advocacy''. Specifically, they assert that the court gave undue prominence to certain evidence, that its comments were not a full and proper summing up of the evidence and that it invaded the province of the jury by failing to give a judicial and dispassionate discussion of the evidence. Our examination of the court's comment satisfies us that it does not exceed the bounds of propriety set forth in recent decisions of this court. (See *People* v. *De Moss,* 4 Cal. (2d) 469, 476 [50 Pac. (2d) 1031]; *People* v. *Ottey,* 5 Cal. (2d) 714, 722 [56 Pac. (2d) 193]; *People* v. *Gosden,* 6 Cal. (2d) 14 [56 Pac. (2d) 211]; *People* v. *Patubo,* 9 Cal. (2d) 537, 541 [71 Pac. (2d) 270, 113 A. L. R. 1303].) The remark of the court made in the absence of the jury and after it had returned its verdicts could not have prejudiced the appellants.

We turn now to certain contentions peculiar to the Allen appeal alone. This appellant in three assignments of error asserts that the court below erred in ten separate instances in denying his motions to strike from the record certain conversations had or declarations made by Kynette in his absence. Generally, it is urged that these conversations and declarations occurred either prior to Allen's coming into the alleged conspiracy or after the conspiracy had terminated, and were inadmissible hearsay as to Allen. We find no prejudicial error here. As a result of an amendment to the indictment to conform to proof several of the conversations or declarations became material to the conspiracy alleged. Nor do we find any impropriety in the trial court's allowance of such amendment. Under the provisions of section 1008 of the Penal Code a trial court may order an amendment of an indictment ''for any defect or insufficiency, at any stage of the proceedings'' provided it is not so amended ''as to change the offense charged''. The amendment here permitted was clearly within the purview of the statute and contrary to the appellant's contention it did not ''change the offense charged''. The conspiracy charged remained as originally alleged. The amendment merely permitted the specifying of a few overt acts in furtherance thereof in addition to the overt acts originally alleged, and as to all of which there was ample evidence in the record. As to the remaining conversations and declarations, it is well settled that the acts and declarations of one conspirator in furtherance of the conspiracy are admissible against his co-

conspirators. It was for the jury under all the evidence to determine when the alleged conspiracy had its inception and when it terminated. At the time of its admission and when Allen moved to strike the same, the evidence complained of had some relevancy to the alleged conspiracy. Moreover, inasmuch as all the defendants were thereafter acquitted on the conspiracy charge it is difficult to perceive wherein any of them could have been prejudiced by this evidence.

This brings us to the contention of Kynette that the court below erred in instructing the jury that he could be convicted upon any and all of the offenses charged in the indictment. He urges that the verdicts finding him guilty on counts two and three are inconsistent with the verdict finding him guilty on count four. Relying on *People* v. *Koehn,* 207 Cal. 605 [279 Pac. 646], he argues that the intent to murder essential to each of the charges of attempted murder and assault with intent to murder, contained respectively in counts two and three, is inconsistent with the intent to injure alleged in count four in connection with the offense of malicious use of explosives therein charged. We find no merit in the contention. Prior to its repeal in 1939 and the inclusion of its counterpart in the Health and Safety Code as section 12354, section 601 of the Penal Code, under which the appellant was charged in count four, declared that any person who maliciously used explosives ''with the intent to injure, intimidate or terrify any human being, or by means of which any human being is injured or endangered, is guilty of a felony, and punishable by imprisonment in the state prison not less than one year''. In the Koehn case, *supra,* the defendant was charged with and convicted of attempted murder and malicious use of explosives. Under the admitted and peculiar circumstances of that case this court vacated the judgment on the former charge and affirmed the judgment on the latter charge on the ground that the evidence indisputably disclosed that the explosives there had been used ''with the expressed purpose of intimidating and terrifying'' a judge into rendering a particular judgment in a cause then pending before him. The opinion in that case points out the inconsistency between the offense of attempted murder of the judge which, if successful, would have frustrated the effort to procure a favorable decision by the malicious use of explosives which admittedly were intended merely to terrify and intimidate the judge into rendering such favorable decision. The

same inconsistency does not exist in our case, and under the provisions of section 954 of the Penal Code the prosecution was not required to elect. Here, the indictment charged an attempted murder, an assault with intent to murder and the malicious use of explosives ''with the intent then and there to injure the said Harry Raymond''. As already indicated, the evidence was such as to warrant a conviction on any or all of these charges. There is no repugnancy between an intent to kill the victim and an intent to injure him. There can be little doubt that if Kynette had intended by the use of a bomb to kill Harry Raymond, as found by the jury, he must also have intended to sufficiently injure Raymond by flying fragments of the exploded bomb as to cause his death. Under the evidence in this case, it is impossible to conceive how there could have been an intent to kill Raymond without at the same time entertaining an intent to injure him. Or, those responsible for planting the bomb could well have concluded, under the prosecution's theory, that the exploding of the bomb would either kill the victim or so maim him as to preclude or deter him from making further attacks upon the city administration. To follow appellants' contention to its logical conclusion would lead to the absurd result of holding that proof of a defendant's intent to kill the victim would be a defense to a prosecution for the malicious use of explosives with intent to injure said victim. In short, we are of the view that an intent to injure is of necessity a part of an intent to kill, particularly when, as here, the latter intent is attempted to be effectuated by means of an explosive which necessarily must tear and maim the body of the victim. We find it unnecessary to discuss at length the case of *People* v. *Werner,* 29 Cal. App. (2d) 126 [84 Pac. (2d) 168], cited by the appellant, for it too presented a distinguishable factual situation. The offenses there charged were solicitation to offer a bribe and attempted grand theft. As pointed out therein, the money could have been procured from the victim either for bribery purposes or because the defendants intended to divert it to their own use. But, as there indicated, only one of such intents could have existed.

While we are satisfied that no inconsistency exists in the several verdicts and judgments against Kynette and that he properly stands convicted of attempted murder, assault with intent to murder and the malicious use of explo-

sives, we are not unmindful of the fact that all three offenses though involving variable elements are traceable to and are the direct result of the placing of a bomb in the automobile of the victim Raymond. In view of this, it would have been more in conformity with the legislative intent expressed in section 654 of the Penal Code to preclude more than one punishment for an act ''punishable in different ways by different provisions of this code'', if the court below had caused all three sentences to run concurrently rather than two of them, with the third running consecutively. The attorney-general appears to recognize the reasonableness of such a result, for in one of his briefs he states that ''Under these circumstances, we submit that if the Court is of the opinion that this set of circumstances come within the provisions of section 654 of the Penal Code, that the simple remedy is . . . to decree that the defendant Kynette shall suffer the greatest penalty, namely, that provided by section 601 of the Penal Code.'' We are of the opinion that to give effect to the legislative intention expressed in section 654 all of the sentences should have been made to run concurrently and that this court may now so direct under the power conferred by section 1260 of the Penal Code to ''reverse, affirm, or *modify* the judgment or order appealed from . . . '' Pursuant to statutory authority an appellate court may now reduce the degree of a crime when appropriate, without ordering a new trial. (*People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609].) See, also, *People* v. *Wagner,* 78 Cal. App. 503 [248 Pac. 946] ; *People* v. *Ryan,* 74 Cal. App. 125, 129 [239 Pac. 419]. Where, as here, the several judgments and sentences should appropriately be made to run concurrently, this court may accordingly modify the same without in any manner interfering with the discretion normally vested in a trial court by section 669 of the Penal Code to determine whether two or more judgments should run concurrently or consecutively.

It follows that the several judgments and orders involved in the Allen and Kynette appeals must be, and each is, hereby affirmed with the exception of the judgment entered against Kynette upon his conviction under count four of the indictment charging malicious use of explosives, and that judgment is hereby modified so as to cause it and the sentence therein imposed to run concurrently with the remaining judgments and sentences against him.

Rehearing denied.