[Crim. No. 1960. First Appellate District, Division One.—July 6, 1938.]

THE PEOPLE, Respondent, v. LEWIS J. HALL, Appellant.

Nathan C. Coghlan, James B. Boland and Walter C. Frame for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

KNIGHT, J.—The defendant was charged with the murder of one Clyde E. Badgley, and a jury found him guilty of manslaughter. Following the denial of motions for a new trial and in arrest of judgment he was sentenced to imprisonment in the state prison; and from the judgment of conviction and the order denying the motion for new trial, he has appealed.

The admitted facts are that appellant shot Badgley with an automatic pistol while they were alone in appellant's living apartment on Grove Street, in San Francisco, the bullet having entered Badgley's abdomen and causing death a few days later. At the time of the homicide Badgley was an enlisted soldier, twenty or twenty-one years old. He had been in the service less than seven months. Appellant was forty-eight years old, and for several years had been in the employ of the Market Street railroad. Shortly after the shooting occurred Badgley made a brief oral statement, according to which he was shot intentionally and without provocation. Appellant also made certain statements as to the circumstances attending the shooting, but they were sharply conflicting. He claimed first that it was purely accidental, but afterwards insisted it was done in self-defense during a quarrel. The statements were made by him at the scene of the shooting soon after it happened, following which he was taken to police headquarters where, in the presence of an

army officer and the inspectors of police, the substance of his final oral statement was reduced to writing and signed by him. Summarized, his final version was that continuously for more than five years immediately preceding the shooting Badgley had been carrying on with him a degenerate relationship for which he had been paying Badgley money; that on the afternoon of the shooting Badgley demanded more money, which he was unwilling or unable to pay; that thereupon a quarrel took place which ended in the fatal shooting. All of the statements so made were received in evidence, and appellant now contends that there was no causal connection between the immoral relationship and the killing, and that therefore the trial court erred in not excluding his declarations relating thereto. There is no merit in the contention.

The record shows that when first questioned by the police appellant made no disclosure whatever of the existence of the immoral relations, nor did he indicate there had been any quarrel. Quite to the contrary he claimed, as stated, that the shooting was purely accidental. His story was that he picked up his pistol to examine it, and that Badgley asked to see it; that he declined to let him have it, saying, ''Don't monkey with that gun''; that nevertheless Badgley grabbed for it and during the scuffle the pistol was accidentally discharged. But when asked by the inspector of police in charge of the case to demonstrate just how the shooting took place, he attempted to do so and failed. The inspector then told him he did not believe the story and in effect accused him of having maintained immoral relations with Badgley; whereupon appellant began to cry and said he would tell ''the true story''. He then went on to tell of the immoral relations that had been carried on between Badgley and himself for the past five years or more, and the payment to Badgley of much money during that period of time; also what he claimed were the circumstances leading up to and surrounding the shooting. In this latter respect he stated that on the day preceding the shooting he drove to Watsonville with Badgley and another soldier named Hutchins, in the latter's automobile, to visit some friend of Badgley's, but they were unable to find him, so they stayed there overnight and returned to San Francisco the next day, reaching his apartment about noon, where all three ate lunch; that as soon as they finished eating lunch Badgley began demanding money and he replied

he had only ninety cents; that Badgley persisted in his demands, saying he had to have some cash, that he was going to meet someone in Golden Gate Park that night, and that appellant had plenty of money in the bank which he could withdraw; that thereupon all three drove downtown to appellant's bank and appellant went inside; that upon returning to the automobile he told Badgley he had no more money in the bank; and all three then drove to the car barns out of which appellant worked and from there to appellant's apartment. He claimed that they returned to his apartment for the purpose of getting some tape with which to repair a cracked curtain on the automobile. Continuing, he stated that Hutchins waited outside in the automobile while he and Badgley entered the apartment to get the tape, which he kept in a table drawer wherein he also kept his loaded pistol; that upon opening the drawer to get the tape Badgley renewed his demands for money and a quarrel started over his inability or refusal to pay the same; that he told Badgley that he had been giving him money, clothes and shoes for the past four or five years and that he had no more money left; that the quarrel grew bitter and they began calling each other vile names; that finally Badgley called him in effect a "lousy" degenerate; that he denied being such and replied that Badgley was the degenerate; that Badgley then arose from the couch on which he was seated and moved toward the open drawer of the table containing the pistol; and that believing Badgley was about to seize the pistol he "beat him to it", and grabbed the pistol himself; that as he did so Badgley "made a lunge" at him; that he stepped back and pulled the trigger twice; that the pistol did not fire the first time but did the second time, and Badgley staggered into the next room and fell on the floor; that he followed him into the room and opened his shirt, but could find no wound, so after giving Badgley a drink of water he went downstairs and Hutchins drove him to the emergency hospital to get an ambulance. After having given his final version of the shooting appellant was taken, as above stated, to the police station where the substance of his final oral statement was reduced to writing and signed by him.

At the trial appellant repeated the story of the trip to Watsonville, and of Badgley's demand for money upon their return; also of their visit to the bank and of the quarrel that

took place in his apartment when Badgley renewed his demands for money. Furthermore he told of the vile names they, called each other; but his testimony as to the circumstances attending the shooting was considerably at variance with both of his previous accounts thereof. There he claimed that as soon as the quarrel started over the demand for money and they began calling each other vile names, they grappled and wrestled around the room for eight or ten minutes before the shooting took place; that during the struggle they neared the open drawer where the pistol was exposed and he grabbed the pistol to prevent Badgley from getting it; that finally, as the struggle continued the pistol was in some way discharged, and Badgley staggered into the next room and fell.

Badgley's statement describing the manner in which he was shot was flatly contradictory to any of the versions given by appellant. It was related at the trial by the prosecution's witnesses without any objections being made by appellant to its introduction. In this regard it appears from the record that at first Badgley declined to make any statement or answer any questions concerning the shooting; but a few minutes afterwards upon realizing his critical condition he not only declared that appellant had shot him, but told the circumstances thereof. In this connection he stated that appellant came into the room, pointed the pistol at him, and pulled the trigger; that it clicked twice; that the first time it did not fire, but the second time it did and he was shot. He declined to say, however, why appellant shot him, and when asked to give his reason for so declining he merely said he "was ashamed of something". Hutchins disappeared prior to the trial, which did not take place until a year after the shooting. Therefore his testimony was not available.

It is well settled that in cases of homicide the presence or absence of motive to kill is always material whether the killing is admitted or denied, and that therefore evidence having a direct tendency, in view of surrounding circumstances, to prove motive on the part of a person to commit a homicide, and thus solve a doubt either as to his guilt or innocence or as to the degree of crime committed, is always admissible, however discreditably it may reflect upon the defendant, and even though it may show him to be guilty of other crimes. (*People* v. *Cook,* 148 Cal. 334 [83 Pac. 43];

*People* v. *Hendrix,* 192 Cal. 441 [221 Pac. 349] ; *People* v. *Gosden,* 6 Cal. (2d) 14 [56 Pac. (2d) 211] ; *People* v. *Bowers,* 1 Cal. App. 501 [82 Pac. 553] ; *People* v. *Young,* 102 Cal. 411 [36 Pac. 770] ; 13 Cal. Jur., pp. 686, 687.) And especially is such evidence admissible where as here the killing is claimed to have been done in self-defense (*People* v. *Walters,* 98 Cal. 138 [32 Pac. 864]) or upon a sudden quarrel or heat of passion (*People* v. *Cook, supra,* overruling a contrary holding in *People* v. *Gress,* 107 Cal. 461, 463 [40 Pac. 752], cited by appellant).

In the present case, as will be seen, appellant himself, in giving his oral and written statements on the day of the shooting, assigned the immoral relationship as the direct and sole cause of the altercation which resulted in the killing; but he claimed the killing was done in necessary self-defense, which if true exculpated him from criminal responsibility; whereas, on the other hand, the prosecution at all times challenged the truth of his story of self-defense, and from the beginning claimed that the killing was premeditated and accompanied with malice, and therefore was murder, the theory advanced in support of such claim, stated generally, being that appellant shot Badgley in a fit of jealousy arising out of their immoral relations and to put an end for all time to Badgley's constant demands for money and to prevent any possible future exposure by Badgley of their prior immoral relations. And in view of the conflicting stories told by appellant as to the circumstances of the shooting, all of which were in substance contradicted by the statement made by Badgley, it would seem that no discussion is required to point out that there is ample evidentiary justification for the prosecution's theory. As said in *People* v. *Brown,* 130 Cal. 591 [62 Pac. 1072], facts tending legitimately and fairly according to the ordinary operations of the human mind and the ordinary principles of human conduct to show motive may properly be given in evidence in proof of any assumed motive for the commission of the crime. It is our conclusion, therefore, that under the doctrine of the cases above cited appellant's voluntary declarations disclosing the prior immoral relationship not only served as competent evidence tending directly to prove motive and thus to refute his claim of self-defense, but that the matter of said immoral relationship became an important factor in the case to be considered by the

jury in determining, in case it rejected the self-defense plea, whether the killing was accompanied by malice and therefore murder, or was committed upon a sudden quarrel or heat of passion and hence amounted only to manslaughter; and that being admissible for the purposes mentioned, the fact that said evidence reflected prejudicially upon appellant's moral character did not, under the authorities cited, constitute legal grounds for its exclusion.

In the cases cited by appellant involving the question of the admissibility of evidence of extrinsic facts tending to show a meretricious or illicit relationship on the part of the accused, it was clearly pointed out that such relationship had no logical or causal connection with the crime for which the accused was on trial, and therefore had no bearing whatever upon the question of motive. Here, as shown, the factual situation is different. For that reason we do not deem the cases cited by appellant in point.

 The trial court's charge to the jury was quite lengthy. It covers twenty-four solid pages of the typewritten transcript. One of the numerous instructions given related to the legal effect generally of the testimony of character witnesses; and appellant complains of the concluding sentence thereof, wherein the jury was advised that if it was satisfied to a moral certainty and beyond all reasonable doubt that the evidence did not establish the guilt of appellant it was the duty of the jury to find him not guilty. No doubt that part of the instruction was given inadvertently. However, construed literally, it cannot be said to misstate a principle of law because, as will be noted, the court does not say, as appellant seems to contend, that before he could be found not guilty the jury must be satisfied of his innocence to a moral certainty and beyond a reasonable doubt. And it would seem obvious that the jury was not misled by the peculiar wording of the sentence in question for the reason that in several other portions of the charge it was correctly and clearly instructed to the effect that if it entertained any reasonable doubt as to appellant's guilt he was entitled to an acquittal.

After reviewing the entire record, including the evidence, we find no such error as would call for a reversal, nor do we believe the verdict of the jury has resulted in a mis-

carriage of justice. The judgment and order from which the appeal was taken are therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.