[Crim. No. 2494. First Dist., Div. Two. Apr. 12, 1948.]

THE PEOPLE, Respondent, v. HENRY TORRES et al., Appellants.

Leslie C. Gillen, James A. Himmel and Marvin E. Lewis for Appellants.

Fred N. Howser, Attorney General, Leo T. Englert and Clarence A. Linn, Deputy Attorneys General, for Respondent.

OGDEN, J. pro tem.—Appellants were jointly charged and tried before a jury upon two counts, the first charging them with the crime of conspiracy to violate section 347 of the Penal Code and the second charging the completed offense denounced in the same code section. Penal Code, section 347, provides, insofar as it is applicable here, "Every person who wilfully mingles any poison with any food, drink, or medicine, with the intent that the same shall be taken by any human being, to his injury, . . . is punishable by imprisonment in the state prison for a term not less than one year nor more than ten years." Under the conspiracy count two overt acts were alleged; first the mingling of a poison, to wit, a preparation of antimony and potassium tartrate with a highball, consisting of whiskey and soda, with the intent that the same should be taken by one Noel De Selva and the serving thereof to the latter by Coloretti; secondly, the mingling of the same poison with a cognac drink with the intent that the same should be taken by said De Selva and the serving thereof to him by Torres. The completed offense alleged in the second count was predicated upon the same acts alleged as constituting the first overt act, that of mingling said poison with the whiskey and soda highball. All four appellants were convicted upon the conspiracy count. Upon the second count, Torres was acquitted, but the other three appellants were convicted. All four join in this appeal from the judgment of conviction and from an order denying their motions for a new trial. Torres, who was represented by separate counsel at the trial, is also separately represented and filed separate briefs upon this appeal.

The series of events leading up to and culminating in the offenses charged took place in a San Francisco night club known as the "Copacabana," owned and operated by one Joaquin Garay. The appellants were all employed therein; Torres as manager, Coloretti and Silvers as waiters and Ruby as a bartender at the service bar. The complaining witness, Noel De Selva, was the leader of the orchestra under engagement by contract to furnish the music for the night club.

The record discloses that during the few months of the engagement of the orchestra, several disputes and controversies arose between De Selva and members of his orchestra on the one hand and Garay and Torres upon the other. Shortly before the close of the engagement, Garay and Torres requested De Selva to remain two additional nights until the orchestra which was to relieve his was available.

De Selva, after conferring with his musicians, refused to do so unless they were paid double the union scale. Garay and Torres refused to accede to this and replied that De Selva was going to be very sorry for his attitude.

On the last night of his engagement, De Selva was invited by some patrons to sit at their table and to have a drink. An inquiry was addressed to Coloretti, the waiter assigned to that table, as to the availability of scotch whiskey. Silvers, who was passing by, said, ''Certainly we have the scotch for Noel,'' and accompanied Coloretti to the service bar which was located between the dining room and the kitchen. One Cadena, who was employed as a helper or bar boy to the bartender Ruby, testified for the prosecution as to what took place there. When the drinks ordered by Coloretti had been placed upon the bar by Ruby, Silvers asked Coloretti which drink belonged to De Selva and Coloretti pointed to one of them. Silvers then pointed to a small bottle which was kept in the champagne rack behind the bar and in response to his request Ruby handed it to him. Silvers poured some of its contents into the glass which had been indicated as containing De Selva's drink. Coloretti took the drinks to the dining room and served them to De Selva and the patrons at the table where he was sitting. Upon Coloretti's return to the service bar, Ruby asked him who the ''Mickey Finn'' was intended for. Coloretti replied that it was for De Selva because Silvers didn't like him. Cadena thereupon picked up the small bottle from the champagne rack and said to Coloretti, ''I am going to put you in jail because you gave that 'Mickey Finn' to Noel.'' Ruby took the bottle from Cadena and put it back in the rack. About 20 minutes later Torres called Cadena aside and said to him, ''You saw them give a 'Mickey Finn' to Noel?'' Cadena replied in the affirmative and Torres asked him if he could be a witness. Cadena said, ''Yes, I can be a witness any time you want.'' Torres replied, ''No, you cannot accuse any people, you better shut your mouth.'' After Torres left the vicinity of the bar, Ruby said to Cadena, ''You see, all the trouble don't come from Mike Silvers, the trouble comes from the bosses, so keep quiet.'' Torres returned to the bar shortly thereafter and said to Ruby, ''Give me the 'mequilleto' '' (meaning little Mike). The bartender gave him the bottle previously referred to. Torres put it in his pocket and returned to the dining room.

Within a few minutes after taking what he described as just a "sip" of the scotch and soda, De Selva commenced to feel ill, so did not drink more. When he left the table to direct the orchestra, Silvers insisted that he take the drink with him but he refused. After finishing a short period of directing the orchestra De Selva complained to Torres that he felt very sick. Torres suggested that a drink of cognac would be good for him and ordered Silvers to get one for him. A glass of cognac was brought and when De Selva intimated that he didn't know whether he could drink it Torres said, "Come on, drink it and you are going to feel pretty good." De Selva took a "sip" of the cognac and gave it to a member of his orchestra who drank some and passed it on to two other musicians who likewise drank of it. Shortly thereafter De Selva and the three members of the orchestra who had partaken of the cognac became violently ill, each suffering from the same symptoms of acute pains in the stomach, nausea and diarrhea.

In the presence of a police officer, whom De Selva had summoned, and Torres, De Selva complained that he had been served a "Mickey Finn" by Silvers. Torres told the officer that De Selva had complained to him earlier of feeling ill from eating a hamburger sandwich and had told him that he believed he was suffering from ulcers. De Selva denied that he had made any such earlier complaint to Torres.

When Cadena returned for work the following Monday (the above having occurred on a Saturday night) Torres discharged him, saying, "I'm going to punish you, because you make trouble." He returned to his employment, however, on Thursday night (apparently upon the insistence of his union). He discovered the bottle previously referred to in the garbage can and took it home, later turning it over to an investigator of the office of the district attorney.

The contents of this bottle were analyzed by a chemist and toxocologist who testified that it contained a poison, to wit, antimony and potassium tartrate, also known under the name of tartar emetic and commonly known as "Mickey Finn." He described the effects of this poison as being the same as those experienced by De Selva and the three musicians who drank of the cognac.

Coloretti, Silvers and Ruby voluntarily appeared together at a hearing before the board of directors of the musicians' union and they each freely admitted their part in the serving of the "Mickey Finn" in the scotch and soda drink sub-

stantially as narrated above. They disclaimed responsibility, however, for the serving of the cognac drink. Silvers there related how he had protested to Torres as the latter poured the "Mickey Finn" into the cognac drink, and that he refused to serve it, saying, ". . . stop or you will kill them . . . that is enough to kill a mule." Ruby also stated that after Torres had poured part of its contents into the cognac drink he, Ruby, had thrown the bottle into the ash can.

In a statement made to a police inspector, Coloretti admitted that he had served the drink of scotch and soda to De Selva into which Silvers had previously poured some of the contents of the small bottle. He denied, however, any knowledge of the nature of its contents.

None of the appellants testified in their own defense. They did, however, produce the testimony of other employees who were engaged at the service bar on the night of the occurrence to the effect that they had not seen or heard any of the events as related by the witness Cadena. The service cashier testified as to the manner in which the cognac drink was ordered and served and the lack of opportunity for Torres to have contaminated it. Testimony by the janitor and garbage collector as to the daily collection of garbage was produced, apparently for the purpose of showing the improbability of the bottle being in the garbage can four days later as testified by Cadena. Evidence was offered to the effect that De Selva had complained of feeling ill earlier in the evening and before he partook of either drink. Apparently for the purpose of discrediting the witness Cadena, another bar boy formerly employed at the night club testified that he had been, at some time previously, served a "Mickey Finn" by Cadena. In those particulars in which the evidence offered by the defense was in conflict with that of the prosecution it presented issues solely for the determination of the jury, which was entitled to accept or reject it in whole or in part.

■ That the evidence is sufficient to support the judgment of conviction as to appellants Coloretti, Silvers, and Ruby, is so apparent from the above narration thereof as to require but little comment here. Each actively participated in the mixing and serving of the poisoned scotch and soda drink; Ruby by handing the poison to Silvers, Silvers by pouring it into the drink and Coloretti by serving it to De Selva knowing it to have been so poisoned. By so doing with full knowledge of the action of the others, each became

equally responsible for all of those acts which in their entirety completed the offense denounced in Penal Code, section 347. That each did what he did in pursuance of a common agreement between them that the crime be committed is apparent. An unlawful agreement need not be a formal or express one. The law fixes no time at which a conspiracy must have been entered into and it does not provide that it have any particular duration (*People* v. *Yeager,* 194 Cal. 452 [229 P. 40]). If in any manner the conspirators tacitly come to a mutual understanding to commit a crime, it is sufficient to constitute a conspiracy (*People* v. *Yeager, supra; People* v. *Sisson,* 31 Cal.App.2d 92 [87 P.2d 420].) It may result from the actions of the defendants in carrying out a common purpose to achieve an unlawful end (*People* v. *Montgomery,* 47 Cal.App.2d 1 [117 P.2d 437]).

We can not agree with the contention of appellant Torres that "there is not one word in the entire transcript that connects him either directly or by circumstantial evidence with any conspiracy or that there was any understanding between this appellant and the other defendants to put any poison, or anything else, in the scotch and soda, and later, the cognac." On the contrary we find ample evidence to support the verdict of the jury as to him. In determining the sufficiency of the evidence to establish his membership in the conspiracy we confine ourselves, as we must, to a consideration of his actions alone. In this we are, as was the jury, entitled to consider all of his conduct both before and after the commission of the crime. We find none of it compatible with his protestation here of innocence but rather find it all supporting a strong inference of guilt. From some source, not disclosed by the record, he learned of Cadena's protestations because of the serving of the "Mickey Finn." He took action, not against the waiter, but against Cadena, admonishing him "to shut your mouth," and discharged him "to punish you, because you make trouble." He asked Ruby for the bottle containing the "mequilleto" and put it in his pocket. He ordered the cognac drink for De Selva and urged that the latter drink it. That that drink contained the same poison as did the scotch and soda is apparent from its effect upon all those who drank it. He gave a false explanation of De Selva's illness to the police officer to whom De Selva complained. From these circumstances the jury was well entitled to infer and believe that Torres was a party to the unlawful agreement.

■ Appellants complain of prejudice resulting from the admission in evidence of statements made by one or more defendants containing matters incriminating others not present. Torres cites as error the admission of the statements made by his codefendants before the officers of the musicians' union. Although in his brief he states that those statements were admitted as evidence against him, an examination of the transcript shows that not to be the case. The record discloses that in every instance where evidence was received of subsequent statements made by one or more of the defendants out of the presence of any of the others, the trial court limited the effect of such evidence to the defendant or defendants present and participating therein. In every such instance the jury was clearly and adequately admonished that it was not to consider such evidence in determining the guilt or innocence of any defendant as against whom such evidence was excluded. In instructing the jury at the conclusion of the case the learned trial judge again correctly and adequately stated the law with respect to the limited effect of such evidence and repeated his admonition against improper consideration of it. There was no error in permitting the admission of such statements since each constituted an admission on the part of the defendant making it and tended, at least to some degree, to connect him with the commission of the offenses charged. The trial judge performed his full duty in protecting the rights of the other defendants with respect thereto.

■ We find no prejudicial error in the rulings of the trial court upon the admissibility of evidence. The testimony of De Selva as to his many disputes and controversies with Garay and Torres was admissible for the purpose of indicating a motive for the crime. (*People* v. *Willis,* 70 Cal.App. 465 [233 P. 812]; *People* v. *Fitzgerald,* 14 Cal. App.2d 180 [58 P.2d 718]; *People* v. *Hall,* 27 Cal.App.2d 440 [81 P.2d 248].) Torres was present and participated in all of the controversies referred to in the testimony. Its effect was to indicate a motive on the part of Torres and was admissible against all those who later joined with him in the unlawful conspiracy which, the jury was entitled to believe, was actuated by that motive.

■ The testimony of the members of the board of directors of the musicians' union as to the statements made by Coloretti, Silvers and Ruby can not be said to be, as contended by appellants, so conflicting and contradictory as to be incredible. We find no discrepancies therein which can not be reasonably attributed to the usual variance found in the honest recol-

lections of different individuals. The weight to be attached to the testimony of these witnesses was solely within the province of the jury to determine. An adequate foundation was laid for the admission in evidence of the small bottle as the one used and for the testimony of the chemist as to its contents. No showing of prejudice is made resulting from the permitting of the police inspector to read a transcription from shorthand notes made by a stenographer of the statement made to him by Coloretti. In the absence of even the suggestion that the transcription was not correct, the ruling, if erroneous, can not be said to be prejudicial.

Prejudicial misconduct of the district attorney, in his opening statement, during the course of the trial and in his argument, is claimed. It is contended that many of his remarks fall within the category of those which required a reversal in the case of *People* v. *Hidalgo,* 78 Cal.App.2d 926 [179 P.2d 102]. The assistant district attorney and one of the attorneys for the defense engaged in the trial of the case before us were the same counsel as in the Hidalgo case. ■ In the record before us there appear frequent instances of repetition of the unseemly exchanges of personalities denounced in that case as reprehensible and unbecoming to a courtroom. We do not approve of nor condone such conduct upon the part of either counsel who again equally engaged in them here. Although unnecessarily prolonging the trial and taxing the patience of the trial judge and the jurors, we are not able to say they resulted in such prejudice to appellants as to require a reversal. The type of argument condemned in the Hidalgo case as predicated upon the prosecutor's personal opinion of guilt not based upon the evidence was not used here. ■ The experiences of the prosecutor and others alluded to in his argument can not be said to seriously exceed the bounds of fair illustration (*People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794]). He was entitled to state to the jury and to argue his opinions and deductions based upon the evidence adduced. We have carefully reviewed the many instances in which it is claimed that he exceeded that right and find none in which he seriously went beyond the bounds of fair argument. ■ The comment upon the failure of appellants to deny or explain by their testimony any of the accusations made against them is expressly authorized by article I, section 13 of the Constitution and by Penal Code, section 1323. The right to so comment is not, as stated by appellant Torres in his brief,

limited to cases where the defendant has become a witness (*People* v. *Adamson*, 27 Cal.2d 478 [165 P.2d 3]).

The district attorney committed no misconduct in his argument in referring to and quoting from the admissions made by Coloretti, Silvers and Ruby which were received in evidence as against them, but excluded as to Torres. Those portions thereof which incriminated Torres likewise incriminated and were competent evidence of the guilt of the defendant or defendants making them. Certain portions tended to refute certain testimony of the defense witnesses and it was proper argument to attack the credibility of the latter by directing the attention of the jury to these inconsistencies. Because these admissions were not evidence of the guilt of Torres did not preclude the prosecutor from arguing their full effect within the limits of their competency. There was no suggestion in his argument that any of these admissions be considered by the jury in determining the guilt of Torres. On the contrary, he expressly cautioned the jury, in his closing argument, not to so consider them, saying, ''Now, ladies and gentlemen of the jury, the statements that were made before the Board of Musicians, and I'm sure that the Court will so instruct you, in which the three defendants appeared were admissible and are admissible and are competent evidence so far as they are offered and as against all individuals who were at that time present when the statements were made. Listen for the Court's instruction on that particular effect. Henry Torres was not there. Under the hearsay rule he's not present when the admissions are made, therefore, it is not to be used as against him.''

Repeatedly during the argument, objection was interposed by counsel for Torres to any reference to the admissions of the other defendants. In every such instance the court repeated its admonition to the jury that these admissions were not to be considered as evidence against Torres. In ruling upon one such objection during the argument the trial judge read to the jury, from the transcript, his previous ruling as to the limited effect of this evidence as follows: ''The motion will be denied and the objection will be overruled. But the jury will be instructed again definitely and distinctly and clearly, I trust, that evidence of this kind and character cannot be used against any defendant who was not present or a party to it. In this instance, if it should develop, as it has in the previous instances, that the defendant Torres was not present and did not participate in these conversations, it cannot be used in any wise

in connection with proving the alleged offense against him. Briefly it may be said that evidence which is received, as is this evidence and as was the evidence of the conversations heretofore testified to by other witnesses, in which certain defendants participated, may be considered by you only as against the defendants who made the statement, and must not be considered by you in connection with the case of any other defendant, unless that defendant was present and participated in it.''

The record is so replete with instances where the jury was so instructed and cautioned as to leave no doubt but that it fully understood the limited effect of this evidence and its duty with respect to it. Although in the formal instructions to the jury only general reference was made to these admissions and their limited effect, the instruction given was adequate, particularly in view of the many more specific instructions given during the course of the trial.

The jury was fully and correctly instructed as to the law. Appellants complain of the failure of the trial court to give several of their proposed instructions. All such proposed instructions that were applicable or contained a correct statement of the law were adequately covered by the instructions given. The contention that the court was here required to instruct as to the necessity for corroboration of the testimony of an accomplice in accordance with Penal Code, section 1111 is devoid of merit.

The judgment and the order denying their motions for new trial are affirmed as to all appellants.

Nourse, P. J., concurred.

DOOLING, J.—I concur in the affirmance of the judgments of conviction of the defendants Coloretti, Silvers and Ruby. I dissent from the order affirming the judgment against the defendant Torres.

Evidence of declarations made, long after the termination of any conspiracy, by the defendants Coloretti, Silvers and Ruby before the board of directors of the musicians' union was admitted over the repeated objections of counsel for Torres that it was not binding on Torres. The court properly ruled at the time that this evidence could not be considered by the jury against Torres. In the face of such ruling, several times repeated, the prosecuting attorney frankly admitted, while the testimony was being introduced, that *his* purpose in eliciting

it was to involve Torres. This hearsay evidence was the only evidence in the case directly connecting Torres with the putting of knockout drops in the glass of cognac served to De Selva. Substantially it was that Torres put a heavy dose of the knockout drops in the cognac glass; that Silvers said: "For Christ's sake don't give that to them. It will kill them," that Torres said that it was meant for De Selva and the bass player; that Silvers refused to serve it to them and that Torres procured a waiter other than the defendants to serve the cognac; and that Torres put enough of the knockout drops in the cognac glass "to kill a mule."

During the prosecuting attorney's argument to the jury the following occurred:

"Mr. Mullins: . . . And this time Torres is going to be sure. This time not a few drops, but a whole lot from the bottle and he's going to see that there is enough in there so that at this time De Selva really gets it, and gets it good. And Silvers, of course, was quite willing to give a Mickey Finn but now he gets scared, it looks like murder to him. Torres is putting in enough to kill a mule.

"Mr. Gillen: I'm going to object to any line of testimony or any statements on that line. We went over that very carefully when the musicians, when the Petrillo boys were on the witness stand.

"The Court: What is your objection?

"Mr. Levin: That it is a deliberate misquotation. Your Honor has stricken from the testimony and has ruled there will be nothing in the testimony that will be hearsay evidence and we went into that entire musicians' stuff. They came and tried to drag in Torres. Counsel said the purpose of that hearsay was to drag Torres in.

"The Court: No speeches.

"Mr. Levin: It is a deliberate misquotation and I assign it as misconduct and I ask for a mistrial at this time on that basis.

"The Court: The objection will be overruled. Keep in mind the instructions and admonitions heretofore given both during the course of the taking of the testimony, the limited purpose of any evidence when it was so limited, and the further instruction with respect to counsel's arguments.

"Mr. Levin: Do I understand Mr. Mullins can now go into the evidence—

"The Court: The Court has ruled, counsel."

Following the last ruling the prosecuting attorney continued to argue the hearsay testimony against Torres.

That it was gross misconduct of the prosecuting attorney to argue the effect of this hearsay testimony against Torres is obvious. That it was prejudicial misconduct seems clear to me from the following considerations:

The jury was instructed clearly that each member of a conspiracy is legally responsible for the act of any other member of the conspiracy. In the face of this instruction the jury found Torres not guilty of the substantive offense of giving De Selva poison in the whisky and soda. This verdict indicates that the jury must have found that Torres did not become a member of the conspiracy until after the whisky and soda had been served to De Selva. If they so believed, the hearsay testimony that Torres put enough knockout drops in the cognac "to kill a mule," so much that Silvers would not take the responsibility of serving it, could easily have turned the scales against Torres in their determination that he entered the conspiracy after the poisoned whisky and soda had been served.

The error of the trial court in overruling the objection to the prosecuting attorney's argument of the hearsay testimony against Torres was not cured by the general admonition of the court in connection with the ruling: "Keep in mind the instructions and admonitions heretofore given both during the course of the taking of the testimony, the limited purpose of any evidence when it was so limited, and the further instruction with respect to counsels' arguments."

The objection to this line of argument should have been promptly sustained and the jury clearly and plainly instructed at that time to disregard it. Only so, if at all, could its damaging effect have been eradicated from the minds of the jury. The effect of permitting the erroneous argument to stand and to be continued by the prosecuting attorney while at the same time giving an instruction in such general terms, not pointed directly to the objectionable character of the argument being made, must at best have been confusing to a jury of laymen, and at worst might well have convinced them that the judge by overruling the objection to this line of argument had placed his approval upon it.

In the final instructions to the jury, which cover more than 30 pages of the reporter's transcript, the following instructions, not pointed to this particular evidence in any way, were given on this particular question:

"No act or declaration of a conspirator that is committed or made after the conspiracy has been terminated by its purpose have been fully accomplished or by its objective having ended is binding upon his co-conspirators, and they are not criminally liable for any such act or declaration."

"Now, in the trial of this case, ladies and gentlemen, there were instances when certain evidence was admitted as against one or more of the defendants but denied admission as against others. It may be difficult for you, when considering the case for or against any one certain defendant, to disregard any evidence that was admitted only as to another, but that is your plain duty with respect to evidence not admitted by the Court as against a certain defendant, and you must try conscientiously to so treat such a situation."

The latter instruction instead of being clearly mandatory was only precatory in an almost apologetic way: "It may be difficult for you . . . but . . . you must try . . . ."

These general instructions in my judgment were not sufficient to undo the effect of the deliberate and wilful misconduct of the prosecutor in arguing matters against Torres which he knew from the previous rulings of the court, and at another time stated himself, constituted no evidence of Torres' guilt.

I cannot agree with the statement in the majority opinion that there was no suggestion in the prosecutor's argument that any of these admissions be considered by the jury in determining the guilt of Torres. "This time Torres is going to be sure . . . he's going to see that there is enough in there so that at this time De Selva really gets it and gets it good. And Silvers . . . gets scared, it looks like murder to him. Torres is putting in enough to kill a mule." The requoted language finds no basis in the evidence except in the testimony of the statements made by the other defendants before the officers of the musicians' union. It does not tend to incriminate the other defendants in any way but is directed solely against Torres. The fact that the prosecuting attorney at another point in his argument stated to the jury that this evidence was not to be used against Torres only emphasizes the flagrancy of his misconduct in making this particular argument. Courts should not condone the attempts of their own sworn officers to sway juries by any such deliberately improper and illegal means.

Despite the opposite conclusion reached by my associates, for whose judgment and experience I have the greatest respect, I

am unable to agree with them that the portion of the argument of the prosecuting attorney herein discussed did not constitute prejudicial misconduct entitling the appellant Torres to a reversal.

Appellants' petition for a hearing by the Supreme Court was denied May 10, 1948. Carter, J., voted for a hearing.