[Crim. No. 4384.   Second Dist., Div. Three.   Apr. 6, 1950.]

THE PEOPLE, Respondent, v. ALBERT DAENER et al., Defendants; HAROLD JOHN O'ROURKE, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, Howard S. Goldin, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant O'Rourke was convicted by a jury of having conspired with defendant Daener to cheat and defraud John DuHart and Lottie DuHart by criminal means and to obtain money and property from them by false pretenses and false promises with fraudulent intent not to perform such promises. O'Rourke appeals from the judgment.

As grounds for reversal defendant urges that the evidence is insufficient to sustain the verdict and that the court erred in its instructions to the jury.

The DuHarts owned about 2,000 acres of land at Fairmont in Los Angeles County on which they raised wheat and barley. The O'Rourkes had an alfalfa ranch a few miles away. About February 19, 1946, the two families became acquainted and thereafter visited socially. Mrs. DuHart planned a trip to Oregon. She told O'Rourke about it and said she could not go until she had sold their grain. O'Rourke told her that a friend of his named Daener had a grain store in Arcadia and would buy the grain; that he and Daener had been in the liquidating business together. About a week later O'Rourke brought Daener to the DuHart ranch and introduced him to the DuHarts as the man he had been telling them about who would buy their grain. DuHart stated that he had 2,000 sacks of wheat for sale at $5.00 a sack. O'Rourke told Daener to show the DuHarts his credentials, whereupon

Daener showed them "his income tax that he paid in 1946 for either $18,000.00 or $38,000.00," and his card. O'Rourke then stated "He doesn't have to bother about that because all dealings that are to be done will be done through us at our home."

After looking at the wheat, O'Rourke and Daener told DuHart they would take it at $5.00 a sack, which was its reasonable market value, payment to be made by certified check when the last load was taken. Either O'Rourke or Daener told the DuHarts they would pick up the wheat as soon as Daener's trucks were available and take it to Daener's place of business in Arcadia. O'Rourke said Daener had a fleet of trucks, but Daener said his trucks were busy. Beginning a few days later, a Mr. Schwab and a Mr. Kiter picked up the wheat from day to day. The last load was taken on September 6, 1946. That morning the truck driver told the DuHarts the wheat was being taken to California Milling Company. On September 6, after the last load was taken, the DuHarts went to the O'Rourke home in Los Angeles. There they met the O'Rourkes and Daener. Daener said "He had to go down and pay the truck drivers off." O'Rourke said, "Well, you go ahead, Al [Daener], and I will settle with you later." Daener left. O'Rourke then told the DuHarts that as soon as Daener got things straightened around they would get their money. Daener returned later the same evening and told the DuHarts "He hadn't gotten everything straightened out"; he and the O'Rourkes would be up to the DuHart ranch a week from the following Sunday and bring a certified check. O'Rourke concurred. The DuHarts asked why the wheat had been sold to California Milling Company instead of going to Daener's place of business. Daener replied that his warehouses were full. During the conversation Daener said the wheat had been stored at California Milling Company. Later the same evening he said they had sold it because the company did not want to store it but they had tried to store it before they sold it.

On the appointed Sunday O'Rourke, without Daener, appeared at the DuHart ranch. He told the DuHarts not to worry about the money; it was all right; he and Daener would pay them within a short time; Daener had gone to San Francisco on a business trip; and if Daener did not pay for the wheat, he would pay them. Daener wrote the DuHarts from San Francisco that he would see them the following Sunday.

He appeared then without the O'Rourkes. He told the DuHarts he was having trouble with his wife; they would have the money within a short time; he and O'Rourke would come up and pay it; not to worry; they had nothing to worry about; they would get their money. He told them he carried a $100,000 life insurance policy with Occidental which would cover them in case anything happened to him. He gave them a writing to that effect.

The DuHarts next saw O'Rourke at their ranch on October 5. They asked if he had brought their money. He told them not to worry, to keep calm, everything was all right; Daener's "wife had his business tied up and therefore they could not get the money." That afternoon O'Rourke "Got pretty drunk" and said to Mrs. DuHart " 'Oh, Hell, Lottie' he said, 'take it off as loss.' He says, 'You can knock it off as loss on your income.' " The O'Rourkes stayed at the DuHarts that night. The next day O'Rourke had Mrs. DuHart obtain the paper Daener had signed and given her. He then had her sign it and give it to him. He kept it. He also had her sign and give him a bill of sale of the wheat. In part it read: "Note of $10,000 dated 9/6th due and payable in sixty days accepted at 6% interest." He gave her a note for $10,000, dated September 6, signed by Daener, payable in 60 days to the DuHarts, telling her it was just as good as money and that he and Daener would pay it in not more than a week or 10 days. The O'Rourkes left the next morning. The DuHarts did not see either of them or Daener after that until the preliminary hearing.

O'Rourke and Daener employed Schwab to haul the wheat, O'Rourke saying they were to move it to a warehouse and if any questions were asked regarding the ownership of the truck, Schwab was to say it was one of Daener's trucks. O'Rourke told Kiter, Schwab's helper, that he and Daener were big time wheat or grain operators, owned warehouses in Los Angeles, had hundreds of tons of other grain to be hauled, and gave him $5.00 for room rent and meals. Schwab took the first load of wheat to Globe Mills, which refused to take it. O'Rourke had submitted samples of the wheat to Globe Mills, which found it unsuitable for its needs. Daener then sold it to California Milling Company. O'Rourke told the buyer for California Milling Company that he had known Daener as a business man in San Francisco for years and that he was down here doing a little buying. California Milling Company paid Daener $9,501.62 for the wheat as follows: August 23,

$1,194.95, August 27, $1,873.32, August 29, $2,390.56, September 3, $1,185.57, September 5, $1,166.47, September 9, $1,180.54, September 11, $510.21.

Anyone doing business in Arcadia was required to have a city license. Daener did not have an Arcadia license and did not have any place of business or warehouse in Arcadia. At the time the wheat was sold to California Milling Company O'Rourke was in financial difficulty. He had borrowed about $600 and sold a $4,184 trust deed at 25 per cent discount. September 3, 1946, O'Rourke had more than $4,000 in cash in his possession. He obtained a cashier's check for $4,000 and paid a mortgage. Daener testified he loaned O'Rourke $7,600 cash of the $9,501.62 he received from California Milling Company. About $5,000 of the $7,600 had been loaned on September 3d.

O'Rourke was present in Department 42 of the Superior Court in Los Angeles on October 30, 1947, and notified to appear for trial in Department 41 on December 15, 1947. He did not appear and his bail, in the amount of $10,000 was forfeited and a bench warrant issued. He was taken into custody December 6, 1948, in a village in Maine, where he was living under the name of Robert Van Horn.

■ A criminal conspiracy is defined to exist "If two or more persons conspire: . . . 4. To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises; . . ." (Pen. Code, § 182.) A conspiracy may be established by circumstantial evidence. The gist of the crime under section 182 is the unlawful agreement between the conspirators to commit an offense prohibited by the statute accompanied by an overt act in pursuance thereof. An express agreement need not be proved. The agreement may be inferred from the declarations, acts and conduct of the alleged conspirators. (*People* v. *Benenato*, 77 Cal.App.2d 350, 358 [175 P.2d 296].) "If in any manner the conspirators tacitly come to a mutual understanding to commit a crime, it is sufficient to constitute a conspiracy (*People* v. *Yeager, supra* [194 Cal. 452 (229 P. 40)]; *People* v. *Sisson*, 31 Cal.App.2d 92 [87 P.2d 420].) It may result from the actions of the defendants in carrying out a common purpose to achieve an unlawful end (*People* v. *Montgomery*, 47 Cal.App.2d 1 [117 P.2d 437])." (*People* v. *Torres*, 84 Cal.App.2d 787, 794 [192 P.2d 45].) ■ De-

fendant concedes "That false representations were made." He argues that the evidence did not establish his knowledge of their falsity. The evidence need not necessarily establish the defendant's knowledge of the falsity of the representations. It is enough if the evidence establishes that the representations were made recklessly and without information justifying a belief that they were true. (*People* v. *Cummings*, 123 Cal. 269, 271 [55 P. 898].)

We think it patent without comment that the evidence we have related was sufficient to sustain the verdict. The facts sufficiently support the inference that O'Rourke and Daener conspired to commit the crime. A verdict cannot be set aside on appeal unless it clearly appears that upon no hypothesis whatever is there sufficient substantial evidence to support a verdict. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Wright*, 94 Cal.App.2d 70, 78 [210 P.2d 263].)

The court gave this instruction: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination." (California Jury Instructions—Criminal No. 36.) Defendant says the giving of this instruction was error; it "was plainly calculated and designed to impress indelibly upon the jury's mind as a fact of which they must take cognizance that the defendant had fled immediately after he was accused of a crime"; it "clearly assumes that flight was an undisputed fact in the case which the jury was bound to consider"; and it withdrew defendant's explanation of his absence from the consideration of the jury. Penal Code, section 1127c, provides "where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (See *People* v. *Pianezzi*, 42 Cal.App.2d 270, 276, 280 [108 P.2d 685].) The criticized

instruction appears to be more favorable to the defendant than that authorized by section 1127c. The fact that defendant did not appear for trial on December 15, 1947, and that he was found in Maine under an assumed name was admitted. Defendant gave the officer who returned him to California one explanation for not appearing at the time and place set for his trial; he gave another and different one on the witness stand. The instruction did not tell the jury that defendant "had fled immediately after he was accused of a crime"; it did not presuppose the commission of the crime charged (*People* v. *Wier*, 20 Cal.App.2d 91, 94 [66 P.2d 703]); it assumed neither the guilt nor flight of the defendant (*People* v. *Hansen*, 130 Cal.App. 217, 221 [19 P.2d 993]); nor did it withdraw defendant's explanation of his absence from consideration by the jury. The giving of the instruction was not error.

Affirmed.

Shinn, P. J., and Wood, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1950.