[Crim. No. 4651. Second Dist., Div. Three. Aug. 28, 1951.]

THE PEOPLE, Respondent, v. BERNARD EDWIN CURTIS et al., Appellants.

Gerald L. Kales and Harold Shire for Appellants.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendants were convicted by the court without a jury of a conspiracy to violate section 337a of the Penal Code, subdivision 1 (pool selling or bookmaking), 2 (keeping or occupying a place with papers or paraphernalia for the purpose of recording or registering a bet), 3 (receiving, holding, or forwarding money or memoranda which referred to money bet on a horse race), 4 (recording or registering a bet), and 6 (accepting a bet on a horse race). Proceedings were suspended and the defendants placed on probation on the condition that each serve one year in the county jail. They appeal from a nonexistent judgment and from an order denying their motion for a new trial. As no judgment was pronounced, the appeal from the absent judgment must be dismissed.

Defendants' sole assignment of error is that the corpus delicti was not proved and that therefore the court erred in admitting in evidence acts and declarations of the defendants. They contend, apparently, that acts and declarations of an alleged conspirator are not, under any circumstances, admissible to prove the corpus delicti.

On July 20, 1950, a police officer entered an establishment occupied by defendant Hyman at 4459 East Gage Avenue, in Bell, California. The place was equipped with three telephones; one was numbered LUcas 8180. The officer found numerous professional betting markers, owe sheets, and scratch sheets used in bookmaking, and racing forms. The handwriting on the betting markers was that of defendant Curtis. The horses shown on many of the betting markers and owe sheets were running on that date on tracks throughout the country. The betting markers contained ABC columns with figures indicating the amount bet—whether for win, place, or show—and, in a very few instances, winnings. A great many betting markers and owe sheets bore various names followed by "for C." The "C" stood for the agent who placed the bets. One of the scratch sheets had been indexed as to horses by

their index numbers throughout the United States, and the results of races at various tracks had been placed on it. A slip of paper on the message form of the Hollywood Roosevelt Hotel, in the handwriting of defendant Curtis, was found on the floor, torn into "small bits." The name "Curtis" was written on it. The torn slip had the names "Viola," "Janet," "Tommy," "Ted," and "Jordan" on it, with telephone numbers. These names corresponded with names on betting markers. The slip was used in connection with bookmaking. Hyman was not arrested at that time.

On the following day, July 21, 1950, the same officer arrested defendant Hyman at 1215 Viola Street, Glendale. The officer found much betting paraphernalia at this address, including betting markers, a California Digest, and a scratch sheet, the latter two dated July 21, 1950. The betting markers were in the handwriting of Curtis, and were similar to those found at the Bell address. One had "Janet for C" on it; another "Viola for C"; another "Jordan for C"; others with various names for "C." Figures on the betting markers corresponded with figures written on the California Digest and the scratch sheet. The digest had been indexed as to horses by their index numbers throughout the United States, and the results of races at various tracks had been placed on it. Hyman told the officer that the betting markers were not in his handwriting and that this was the first time "he'd been caught making book."

During the time the officer was at the Glendale address a number of telephone calls came in; the persons calling placed bets on horses running that day.

Other officers arrested defendant Curtis in rooms 618 and 619 of the Hollywood Roosevelt Hotel in Los Angeles on July 21, 1950. Curtis had occupied rooms 618 and 619 for a considerable period of time prior to July 21, 1950, and police officers had listened to his telephone calls. The calls indicated that Curtis was referring persons to Hyman for the purpose of placing bets. In one of them he told the person calling to telephone LUcas 8180 to place a bet. An owe sheet, in the handwriting of Curtis, was found in his coat pocket in room 618. This owe sheet contained a bookmaking record for the week ending July 15; the name of each agent, the amount each owed, the amount the book owed to each, the payments to the various agents, a list of expenses, and gross and net profits. The initials of defendant Hyman appeared in the items of expense thus: "J H —— 150 —." Numerous names

on this owe sheet corresponded with the names on the betting markers found at the Bell and Glendale addresses. While the officers were in Curtis' room a number of persons telephoned in to make bets on horse races.

There was evidence of a telephone conversation between defendants Curtis and Hyman as follows: "Mr. Curtis says, 'Always open the door.' Jack says, 'Bernie, I had the door open like this, about a foot.' Mr. Curtis says, 'Always be as nice and polite as you can when those guys come in.' Jack says, 'It sure was nice, it was pretty nice of them, they didn't take any bets.' . . . Jack says, 'I don't care what you say, we had a hell of a day, even if you don't collect a penny.' "

Defendants did not testify and did not offer any evidence.

■ A criminal conspiracy is an agreement, express or implied, to commit any crime or to do any of the acts specified by the statute. (Pen. Code, § 182.) ■ The crime is not complete by the mere agreement, there must be an overt act. (Pen. Code, § 184.) ■ The gist of the offense is the unlawful agreement between the conspirators to commit an offense prohibited by statute, accompanied by an overt act in pursuance thereof. ■ A conspiracy may be proved by direct or indirect evidence, or by both. Usually the only way it can be proved is by circumstantial evidence. ■ To establish a conspiracy it is not necessary to prove that the parties met and actually agreed to jointly undertake the criminal action charged. ■ The order in which the testimony is introduced at the trial is immaterial so long as the conspiracy is ultimately proved. These are commonplaces which require no citation of authority.

■ Generally, the hearsay rule prohibits the reception in evidence of the acts done and the declarations made by one defendant, out of the presence of his codefendant, against such codefendant. One of the exceptions to the hearsay rule is provided by section 1870(6) of the Code of Civil Procedure, which reads: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: . . . 6. After proof of a conspiracy, the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy." ■ The section refers to declarations made by an alleged conspirator out of the presence of his confederate. Section 1870 also provides that evidence may be given of "[t]he act, declaration, or omission forming part of a trans-

action, as explained in section eighteen hundred and fifty.'' (Subd. 7.) Section 1850 reads: ''Where, also, the declaration, act, or omission forms a part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission is evidence, as part of the transaction.''

■ An act, declaration, or omission of one alleged conspirator in the presence of his alleged confederate is not hearsay and is admissible in evidence. ■ An act, declaration, or omission of an alleged conspirator which forms a part of the transaction which is in dispute—the agreement coupled with an overt act—is not hearsay and is admissible in evidence. ■ An act or declaration of an alleged conspirator, not a part of the transaction which is in dispute, made out of the presence of his alleged confederate, is hearsay, and is not admissible in evidence until prima facie proof has been made of the existence of the conspiracy, subject to the power of the trial judge to regulate the order of proof. The very existence of a conspiracy is generally a matter of inference deduced from acts of the persons accused, and frequently from their declarations, written and verbal.

The distinction between admissible and inadmissible acts and declarations of alleged conspirators is lucidly explained in *People* v. *Collier,* 111 Cal.App. 215, 240 [295 P. 898]: ''Now it must be apparent that when an agreement is not in writing parol evidence is admissible to prove its contents. And, when the agreement is in parol, evidence of the conversations of the parties tending to disclose the agreement made is evidence of the very fact to be proved and hence is evidence of the *res gestae*. Hence, when the conspiracy charged in the indictment is an 'agreement' to do or not to do a certain act evidence of the conversations and acts of the conspirators which constitute the agreement is admissible to prove the agreement. Thus, when, as a part of the agreement, one or more of the conspirators undertakes to ask for a bribe, one or more agrees to accept a bribe, one or more agrees to do or not to do some act for the purpose of effectuating the compact, and one or more of the conspirators gives his assent to the compact either by express words or by actions from which such assent might be impiled, evidence of such facts, when the agreement is in parol, is competent evidence of the acts or declarations which form 'a part of the transaction' which is in dispute, and, as such is admissible under the express provisions of section 1850 of the Code of Civil Procedure. On the other hand, if a witness were asked to relate a con-

versation which he had had with one of the alleged conspirators such testimony would be hearsay and would not be admissible under section 1870, subdivision 6 of the Code of Civil Procedure, until after the conspiracy had been proved, and, by thus permitting evidence of the acts and declarations of a conspirator against his coconspirator, this subdivision becomes an enlargement of rather than a limitation upon the ordinary hearsay rule.'' (*Cf. People* v. *Raze,* 91 Cal.App.2d 918, 921, 922 [205 P.2d 1062].) In *People* v. *Daener,* 96 Cal.App.2d 827, we said, page 831 [216 P.2d 511] : ''The agreement may be inferred from the declarations, acts and conduct of the alleged conspirators. (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296].) 'If in any manner the conspirators tacitly come to a mutual understanding to commit a crime, it is sufficient to constitute a conspiracy (*People* v. *Yeager, supra* [194 Cal. 452 (229 P. 40)] ; *People* v. *Sisson,* 31 Cal. App.2d 92 [87 P.2d 420].) It may result from the actions of the defendants in carrying out a common purpose to achieve an unlawful end (*People* v. *Montgomery,* 47 Cal.App.2d 1 [117 P.2d 437]).' (*People* v. *Torres,* 84 Cal.App.2d 787, 794 [192 P.2d 45].)''

 If it is proved that the defendants, with a view to the attainment of the same purpose, pursued such purpose by their acts, each performing some part thereof, the trier of fact is justified in concluding that they were engaged in a conspiracy to effect a common object. (*People* v. *Lawrence,* 143 Cal. 148 [76 P. 893, 68 L.R.A. 193].)

 Hyman was operating a bookmaking establishment in Bell. Curtis was operating a bookmaking establishment in the Hollywood Roosevelt Hotel. Professional betting markers in the handwriting of Curtis were found in the Bell establishment. A message form of the Hollywood Roosevelt Hotel, used in connection with bookmaking, torn into small pieces, with the names ''Curtis,'' ''Viola,'' ''Janet,'' ''Tommy,'' ''Ted,'' and ''Jordan'' on it, all in the handwriting of Curtis, was on the floor. These names corresponded with names on betting markers in the handwriting of Curtis found at the same place. Many of the betting markers and owe sheets bore various names followed by ''for C.'' After the officers visited the Bell address on July 20, Hyman moved his establishment the next day to the Glendale address on ''Viola'' Street. Professional betting markers with ''Janet for C,'' ''Viola for C,'' and other names ''for C'' were found at the

Glendale address. Some of these names appeared on the torn slip found the previous day at Bell in the handwriting of Curtis. "C" stood for the agent who was placing the bets. The court could infer that the "C" in the words "_____ for C" referred to Curtis. If they did not, defendants could and should have denied it. (*People* v. *Steccone,* 36 Cal.2d 234, 239 [223 P.2d 17].) While these writings in the handwriting of Curtis were declarations of Curtis—and, so far as appears, may have been written out of the presence of Hyman—the court was justified in inferring, since they were found in Hyman's possession, that they had been delivered to Hyman by Curtis. The owe sheet found in the possession of Curtis contained some of the same names as appeared on the torn slip found at the Bell establishment and on betting markers found at the Bell and Glendale addresses. Curtis and Hyman had a telephone conversation which clearly referred to the visit of the officer to the Bell address on July 20. The telephone conversations had by the officers at the Glendale address and at the rooms of Curtis were evidence that the premises were occupied for the purpose of bookmaking. The foregoing evidence pieced together was adequate to establish a prima facie case of conspiracy. (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Gonzales,* 20 Cal.2d 165, 173 [124 P.2d 44].) Where there is substantial evidence pointing to a conspiracy, it is not for this court to question its sufficiency. The court did not err in admitting against both defendants evidence of the acts and declarations of the alleged conspirators in furtherance of the conspiracy made out of the presence of his confederate.

The appeal from the nonexistent judgment is dismissed. The order denying the motions of the defendants for a new trial is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied September 6, 1951, and the following opinion was then rendered:

THE COURT.—In their petition for rehearing defendants say "that no where in the record is there any evidence that the so-called betting markers were written by the defendant, Curtis." This is a flagrant misstatement of the fact. An examiner of questioned documents employed by the Police Department of Los Angeles, who qualified as an expert, testi-

fied that in his opinion betting markers found at the Bell and Glendale bookmaking establishments were in the handwriting of Curtis.

Appellants' petition for a hearing by the Supreme Court was denied September 27, 1951.