Filed 8/29/16  P. v. Thomas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL SHAY THOMAS,<br><br>    Defendant and Appellant. | F069865<br><br>(Super. Ct. No. F14902852)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Michael Shay Thomas (defendant) stands convicted, following a jury trial, of attempted murder involving the personal and intentional discharge of a firearm that proximately caused great bodily injury (Pen. Code,[1] §§ 187, subd. (a), 664, 12022.53, subd. (d); count 1), assault with a firearm involving the personal use of a firearm and personal infliction of great bodily injury (§§ 245, subd. (a)(2), 12022.5, subd. (a), 12022.7, subd. (a); count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3). Following a bifurcated court trial, defendant was found to have suffered two prior serious felony convictions (§ 667, subd. (a)(1)) that were also strikes (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and as to each of which he served a separate prison term (§ 667.5, subd. (a)). His request to strike one of his prior convictions was denied, and he was sentenced to prison for a total unstayed term of 10 years plus 52 years to life, and ordered to pay restitution and various fees, fines, and assessments.

On appeal, we hold defendant was not entitled to an instruction on attempted voluntary manslaughter, and the trial court did not err by instructing on flight. We affirm.

## FACTS

As of March 24, 2014, Steven Thomas (Thomas), defendant's brother, resided in an apartment complex on Saginaw, in Fresno.[2] Defendant and the brothers' mother lived in different apartments in the complex. Defendant drove a white Chevrolet Caprice. At trial, Thomas denied having a disagreement with defendant, in the days leading up to March 24, about a white paint transfer on Thomas's girlfriend's car. Thomas also denied having any disagreement with defendant about how defendant was disrespecting their

---

**1** All statutory references are to the Penal Code.

**2** Unspecified references to dates in the statement of facts are to the year 2014.

mother, although they had had such a discussion in the past. Thomas denied getting into an altercation with defendant a day or so before March 24; they merely had "an issue."

Around 6:00 a.m. on March 24, Thomas heard a knock at his apartment door. He did not see who it was. He went outside and saw "a random person" and asked if he had knocked, but the person said no, and so Thomas went back inside. He subsequently took out his trash. Because he threw away something he needed to retrieve, he came out twice. The first time, he saw defendant sitting outside defendant's apartment. The second time, Thomas did not see defendant. He saw some men, but they were too far away for him to identify. None called out to him, and no words were exchanged. He turned away, then felt something hit him. At the same time, he heard gunshots. He ran without looking back. He was struck in the back and both legs.[3]

Thomas made it as far as the medical center on Dakota, "a pretty good block or two" from his apartment. There, he sat down. People came to help him, but he "blank[ed] out" a bit. He did not recall what he said, other than that he had been shot and was in a lot of pain. When he was talking, he did not lie about what had happened.

On March 24, Eric Munoz was a security officer at the Sierra Community Health Center on Dakota. Around 7:20 or 7:25 a.m., he came in contact with Thomas, who was near the health center entrance. Thomas's leg was bleeding and members of the medical staff were assisting him.

In response to Munoz's questions, Thomas gave his name, said he had been shot by his brother (whose name he also gave), and told where it had happened. He said he and his brother were arguing because his brother was cussing at their mother. When the argument went nowhere, Thomas walked away. That was when he got shot with a .38

---

[3] Three expended cartridge casings were found at the apartment complex. Two of the shell casings were stamped ".45 auto," meaning they were .45-caliber ammunition. The third casing appeared to be the same caliber. There were no fingerprints on the casings.

caliber handgun. A police officer and emergency personnel then arrived; Munoz turned the information over to the officer, and Thomas was transported to Fresno Community Regional Medical Center (CRMC) in Fresno.

Fresno Police Officer Garza followed Thomas to CRMC and spoke with him about 20 to 30 minutes after arrival. Although Thomas had an IV in his arm and was complaining about pain, his eyes were open and he appeared to respond coherently to Garza's questions. Thomas was alert and angry.

When Garza asked what happened, Thomas said his brother Michael shot him.[4] Thomas said they had been arguing over the last couple of days. He thought defendant was disrespecting their mother, calling her names and things, and he told him to stop doing that. Thomas said the night before, they got into a wrestling-type fight. Nobody threw a punch; they were just on the floor, wrestling.

Thomas told Garza that he was in his apartment around 6:00 that morning when defendant knocked on the front door. Thomas ignored him. Between 7:00 and 7:30 a.m., Thomas walked out of the apartment to discard the trash. As he was walking away from the trash cans, defendant came up and said he had been waiting up all night for Thomas. Defendant then pulled a gun that Thomas thought was a .38- or .40-caliber, and pointed it at Thomas. Thomas was shocked. He was not sure what to do, but then decided to turn around and run away. As he was running, he heard several gunshots and felt bullets striking his body.

Fresno Police Detective Miranda and his partner, Detective Fenstermaker, responded to the hospital around 10:00 a.m., after being briefed by officers on scene at

---

**4** At trial, Thomas stated that when he spoke to Garza, he was traumatized and on medication. He assumed it was defendant who shot him because of past arguments they had had. Months earlier, they had argued over defendant borrowing a little money on occasion and Thomas wanting it back. Also, defendant had shot Thomas in the toe in 1992. Defendant did not shoot him on March 24, however.

4.

the apartment complex. Miranda spoke with Thomas, who was being treated in the emergency room. Thomas was upset, angry, and in a lot of pain. He was, however, very coherent.

During the interview (an audio recording of which was played for the jury), Thomas said what happened was the "same shit" as happened 15 years earlier, with defendant disrespecting people and their mother, and Thomas asking defendant to "chill out" a little. Thomas said he did not think defendant was trying "to do it," but was just trying to scare him.[5] Thomas related that the day before, Thomas's girlfriend's car was hit. Thomas asked defendant about it; defendant said he did not care. Thomas thought defendant did it.

Thomas related that at about 7:15 that morning, he saw defendant walking away. Thomas already knew what was happening. He thought maybe, if he went outside with defendant, defendant would "chill out."[6] He decided to take out his trash on the way. When Thomas reached the gate by his apartment, defendant started walking toward him. They exchanged words, and Thomas laughed about it. Thomas felt defendant was trying to make his mind up to do what he needed to do. Defendant pulled out a revolver Thomas believed was .38-caliber. When Thomas saw the pistol, he turned around and ran. He felt shots and kept running. He did not know if defendant got into a car, as he did not look back. Defendant did have a white Caprice, however.

At the conclusion of the interview, Miranda returned to the police department and printed out a photograph of defendant. He returned to the hospital about 11:15 a.m. Thomas was at the same location and seemed the same physically and in terms of being coherent. During Miranda's second interview of Thomas (an audio recording of which

---

[5] Miranda believed Thomas was referring to the earlier shooting.

[6] Thomas explained that defendant had threatened him, but Thomas felt all defendant had to do was leave their mother alone, and they could "still be cool."

was played for the jury), Thomas identified the photograph as being defendant, whom he described as "[t]rip pin [*sic*] off what happened" the day before. Thomas confirmed they had been arguing about defendant disrespecting their mother, but said he did not believe he got the best of defendant and did not hurt him.

Fresno Police Detective Harrell was assigned to look for defendant's white Chevrolet Caprice. There were several locations in Fresno to which police thought the vehicle might go. One of the addresses, at which defendant previously had been contacted, was in the 3900 block of East Woodward.

At 10:30 a.m., Officer Potts contacted Harrell and said he had located the vehicle in the parking lot at that location. When Harrell arrived, he began surveillance to see if defendant arrived or left or if the vehicle left. Harrell also kept an eye on apartments 201 and 202. He saw a man, who resembled defendant, and a woman walk into the parking lot, then toward the stairwell that led to those apartments. There was another man outside, and the three appeared to have a conversation. The man who resembled defendant and the woman then went up the stairs toward one of the two apartments.

A short time later, Harrell used the loud speaker from a police car to identify himself as a police officer and to call defendant by name to step out of the apartment. This went on for some time with no contact, but finally the person Harrell had seen earlier on the stairwell in front of apartment 202, walked out with a baby in his arms. He came downstairs as directed, and was contacted and detained. Defendant then came out as directed. He cooperated with police and was taken into custody. He was unarmed. This was at least 30 minutes after the car was identified.[7]

---

[7] No gun was found at the crime scene, in the Caprice, or in the apartment at which defendant was located. Miranda, who was the lead detective in this case, was notified at 2:00 p.m. that defendant was in custody. Fenstermaker requested that a gunshot residue (GSR) test be conducted on defendant. Scott West, a supervisor in the Fresno Police Department's Crime Scene Investigation Bureau, collected a GSR kit around 4:40 that afternoon, but did not know it was ever tested. As far as Miranda knew, no gunshot

In the two weeks following March 24, Thomas telephoned Miranda four to five times a week and also sent him text messages with questions about the case. He also thanked Miranda a couple of times for helping him with the arrest. He was upset and said he could not believe his brother had tried to kill him.

## DISCUSSION

### I

### FAILURE TO INSTRUCT ON ATTEMPTED VOLUNTARY MANSLAUGHTER

Defense counsel originally requested that the court instruct on attempted voluntary manslaughter, based on sudden quarrel/heat of passion and on imperfect self-defense, as a lesser included offense of attempted murder, as charged in count 1. During the instructional conference, the trial court stated it saw no basis for instructing on any form of self-defense; however, there was some basis for heat of passion in Thomas's testimony. Defense counsel agreed. The prosecutor stated he did not know, but "tend[ed] to agree." After discussion of unrelated issues, the following occurred:

> "[DEFENSE COUNSEL]: Your Honor, if I did request lessers I am withdrawing my request. Obviously, the court can do it sua sponte, but I'm not requesting lessers, at least felony lessers. [¶] . . . [¶] . . . [I]n terms of what the evidence shows, . . . I believe there is enough to allow for an instruction on voluntary under, as we stated previously, under a theory of heat of passion. However, I'm not specifically asking for it. [¶] . . . [¶] . . . In other words, the court can do it sua sponte but I'm not asking for it because, frankly, any one felony will expose my client to life exposure. I don't want to give them more felonies to consider."

Defendant now contends the trial court erred by failing to instruct sua sponte on attempted voluntary manslaughter, based on sudden quarrel/heat of passion, as a lesser included offense of attempted murder. He says the failure to do so violated his state and federal due process rights to a fair trial and to present a defense, and created incomplete

residue was found. West explained that the ability to find GSR diminishes as time passes; hence, no residue being found did not necessarily mean the person tested did not fire a gun.

instructions on the mens rea of attempted murder. Alternatively, defendant claims, defense counsel was ineffective for failing to request such an instruction.

We conclude an instruction on attempted voluntary manslaughter was not warranted by the evidence. Accordingly, we need not determine whether the doctrine of invited error applies. Nor do we need to address defendant's claim of ineffective assistance of counsel, since it necessarily follows that defendant cannot establish he was prejudiced by counsel's omission. (See *People v. Avila* (2009) 46 Cal.4th 680, 705; *People v. Dennis* (1998) 17 Cal.4th 468, 540-541; *People v. Daniels* (1991) 52 Cal.3d 815, 868.)

"[A] trial court must, sua sponte, or on its own initiative, instruct the jury on lesser included offenses 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 194-195, fn. omitted.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) " '[S]peculation is not evidence, less still substantial evidence. [Citation.]' [Citation.]" (*People v. Dennis*, *supra*, 17 Cal.4th at p. 508.)

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citation.] Moreover, . . . the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to

8.

support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 162-163, fn. omitted.) "This means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent." (*Id*. at p. 163, fn. 10.) Doubts as to the sufficiency of the evidence to warrant such instructions are resolved in favor of the accused. (*People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12, superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777.)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on [a] lesser included offense . . . should have been given. [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that . . . is . . . predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)[8]

"[T]he offense of attempted murder is reduced to the lesser included offense of attempted voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion. [Citations.]" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; accord, *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.)[9] "An

---

[8]     Defendant challenges the Attorney General's ability to claim, on appeal, that there was no evidence to support an instruction on attempted voluntary manslaughter, since the prosecutor never disputed the issue at trial. We question defendant's claim of forfeiture. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1075-1076, fn. 4; but see *In re Stier* (2007) 152 Cal.App.4th 63, 74.) In any event, neither the trial court's nor the prosecutor's assessment of the issue constrains us in independently determining whether an instruction on a lesser included offense should have been given. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1251, 1253-1254.)

[9]     We rely on cases involving the reduction of murder to voluntary manslaughter for the applicable legal principles. For our purposes, there is no meaningful difference between the completed crime and an attempt, although we recognize attempted voluntary

intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' [citation], and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.) "[T]he passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]." (*Ibid*.)

"Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59 (plur. opn. of Baxter, J.).) The victim's provocative conduct may be physical or verbal (*ibid*.), and "provocation can arise as a result of a series of events over time" (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245).

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As [the California Supreme Court] explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a

manslaughter, unlike voluntary manslaughter, requires an intent to kill. (Compare *People v. Lasko* (2000) 23 Cal.4th 101, 108 with *People v. Montes* (2003) 112 Cal.App.4th 1543, 1546-1547.) Because of this requirement, defendant's suggestion the injuries inflicted in this case support the inference he lacked the intent to kill and so were more consistent with attempted voluntary manslaughter than attempted murder, is based on a legally erroneous premise.

passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele*, *supra*, 27 Cal.4th at pp. 1252-1253.) In other words, the victim's conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee*, *supra*, 20 Cal.4th at p. 59 (plur. opn. of Baxter, J.).)[10]

Examining the evidence presented at trial in the light most favorable to the giving of an instruction on attempted voluntary manslaughter (see *People v. King* (1978) 22 Cal.3d 12, 15-16), we find that even assuming a reasonable juror could conclude the subjective component of the heat of passion requirement was shown, there was no evidence from which it could be concluded the objective component was shown. At most, the evidence showed defendant may have hit Thomas's girlfriend's car with his own vehicle not long before the shooting; defendant and Thomas argued months earlier about money defendant owed Thomas; they argued about defendant disrespecting their mother over the course of several days before, and the morning of, the shooting; they had a wrestling-type fight, in which no punches were thrown, the night before the shooting; and Thomas ignored defendant when defendant knocked on his door the morning of the shooting. Neither these sorts of arguments or this kind of minor physical tussle rise to the level of provocation necessary to support an instruction on attempted voluntary manslaughter. (Compare *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 [verbal argument in which the defendant and victim cursed at each other, followed by scratching

---

**10** There is no additional requirement that an ordinary person of average disposition "would act rashly in a particular manner, namely, by killing." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

11.

and kicking, insufficient] & *People v. Bloyd* (1987) 43 Cal.3d 333, 350 [the defendant and victim quarreled over course of evening and into early morning; "totality of those verbal assaults" did not constitute evidence of provocation sufficient to reduce homicide to manslaughter] with *People v. Elmore* (1914) 167 Cal. 205, 207-209, 211 [evidence at most proved manslaughter where fatal wound inflicted solely as result of sudden heat of passion excited in the defendant by unprovoked attack and violent blows struck by victim, which included grabbing the defendant by the throat and whirling him around] & *People v. Thomas* (2013) 218 Cal.App.4th 630, 645-646 [jury should have been instructed on voluntary manslaughter due to sudden quarrel or heat of passion where just before shooting, the defendant was involved in heated argument and physical altercation with victim and victim's two companions; the defendant lost the fight and may have been dragged across parking lot].) Although we may speculate the interactions between defendant and Thomas were more heated or physical than Thomas admitted, "[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense. [Citations.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 941; accord, *People v. Rogers* (2009) 46 Cal.4th 1136, 1169.)

Defendant says the absence of an instruction on attempted voluntary manslaughter created incomplete instructions on the mens rea of attempted murder, in that the jury was not adequately instructed that the prosecution bore the burden of proving the absence of heat of passion beyond a reasonable doubt. The prosecution must, of course, prove all elements of the charged offense beyond a reasonable doubt (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278), and jury instructions relieving the prosecution of this burden violate a defendant's due process rights (*Carella v. California* (1989) 491 U.S. 263, 265). Accordingly, the due process clause "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented* in a homicide case." (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704, italics added; accord, *People v. Rios* (2000) 23 Cal.4th 450, 462.) The issue is not

12.

"properly presented," however, where, as here, the evidence was insufficient to entitle defendant to an instruction on attempted voluntary manslaughter because it did not raise a reasonable doubt as to whether the attempted homicide was malicious. (*People v. Najera* (2006) 138 Cal.App.4th 212, 225; *People v. Brooks* (1986) 185 Cal.App.3d 687, 696; *People v. Hyde* (1985) 166 Cal.App.3d 463, 473-475; see *People v. Moye* (2009) 47 Cal.4th 537, 563-564 (dis. opn. of Kennard, J.); *People v. Breverman*, *supra*, 19 Cal.4th at pp. 187, 189-190 (dis. opn. of Kennard, J.).)

## II

### FLIGHT INSTRUCTION

The People requested that the court instruct on flight, pursuant to CALCRIM No. 372. Defense counsel objected, arguing the instruction was not supported by the evidence and presupposed defendant was present at the shooting. The court noted counsel was free to argue defendant was never there, but the instruction told jurors what to do if they found he was present and went to another location. It subsequently instructed the jury:

> "If the defendant fled immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant now contends the giving of CALCRIM No. 372 undermined his state and federal due process rights to a fair trial. He says the evidence did not support an inference he fled, and giving the instruction suggested facts not in evidence — that defendant fled because he was the shooter. Defendant claims that without the instruction, a rational juror would have realized Thomas's original statements did not match the physical evidence. We conclude the trial court did not err by giving the instruction.

" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by

13.

the jury, will support the suggested inference.' [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) "Instruction on an entirely permissive inference is invalid as a matter of due process only if there is no rational way the jury could draw the permitted inference. [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243-1244.)

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) Evidence a defendant merely left the scene is not sufficient, standing alone. (*People v. Boyce* (2014) 59 Cal.4th 672, 690; *People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Whenever the prosecution relies on evidence of a defendant's flight as tending to show guilt, an instruction on flight must be given. (§ 1127c.)[11] "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 328.) The evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

In the present case, evidence was presented that defendant lived in the apartment complex at which the shooting took place, and was on foot at the time of the shooting.

---

[11]     That the United States Supreme Court has recognized there may be reasons for flight apart from consciousness of guilt (e.g., *Illinois v. Wardlow* (2000) 528 U.S. 119, 125; *Wong Sun v. United States* (1963) 371 U.S. 471, 483, fn. 10) does not change this fact. Section 1127c "makes mandatory the giving of an instruction on flight where evidence of a defendant's flight is relied upon as tending to show guilt, and the giving of such an instruction in appropriate cases repeatedly has been approved. [Citations.]" (*People v. Cannady* (1972) 8 Cal.3d 379, 391-392, fn. omitted.)

He and his car were not found until several hours later. They were some distance from the scene. Once found, defendant refused, for a significant period of time, to exit the apartment in which he was located, even though he was repeatedly ordered to do so by the police. There was no evidence he attempted to aid Thomas or call for assistance after the shooting, or even attempted to check on Thomas's well-being.

Under the circumstances, the jury could have concluded defendant left the scene to avoid being observed or arrested. (See, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 522; *People v. Bonilla*, *supra*, 41 Cal.4th at p. 329; *People v. Forsythe* (1884) 65 Cal. 101, 104; *People v. Mendias* (1993) 17 Cal.App.4th 195, 202; cf. *People v. Green* (1980) 27 Cal.3d 1, 36-37, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 234-237, 239, & disapproved on another ground in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3; *People v. Watson* (1977) 75 Cal.App.3d 384, 403.) Consequently, there was sufficient evidentiary support to warrant the instruction, even though jurors could have attributed an innocent explanation to defendant's conduct or rejected Thomas's statements to police and so concluded defendant was not even at the scene. (See *People v. Bonilla*, *supra*, 41 Cal.4th at p. 329; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1270; *People v. Mendias*, *supra*, 17 Cal.App.4th at p. 202.)

The flight instruction is a cautionary one that benefits the defense " 'by "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." [Citation.]' [Citation.]" (*People v. Leon* (2015) 61 Cal.4th 569, 608.) It is neither argumentative nor irrational. (*Ibid*.) As given in this case, the instruction assumed neither that flight was established nor that defendant fled; rather, both existence and significance were left to the jury (*People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183; *People v. Crandell* (1988) 46 Cal.3d 833, 870, overruled on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365), as was the determination whether defendant was even present at the shooting (see *People v. Cannady*, *supra*, 8 Cal.3d at p. 392). "The instruction . . . did not presuppose the

commission of the crime charged [citation]; it assumed neither the guilt nor flight of the defendant [citation]; nor did it withdraw [consideration of] defendant's [argument concerning discrepancies between Thomas's original statements and the physical evidence] from consideration by the jury." (*People v. Daener* (1950) 96 Cal.App.2d 827, 833.) If jurors found defendant was not present at the shooting or that his flight was not shown, "they would have disregarded the flight instruction as they were also instructed. [Citations.]" (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1020.)[12]

The trial court did not err by giving CALCRIM No. 372.

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:

_____
GOMES, Acting P.J.

_____
FRANSON, J.

---

[12] Pursuant to CALCRIM No. 200, jurors were told: "Some of these instructions may not apply depending on your findings about the facts of the case. *Do not assume just because I give a particular instruction that I am in any way suggesting anything about the facts* or the findings you make. *After you have decided what the facts are, follow the instructions that do apply to the facts as you find them*." (Italics added.)

16.